BEAL, SECRETARY, DEPARTMENT OF PUBLIC
WELFARE OF PENNSYLVANIA, ET AL. *v.*
DOE ET AL.

No. 75–554. Argued January 11, 1977—Decided June 20, 1977

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 448. MARSHALL, J., filed a dissenting opinion, *post*, p. 454. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 462.

*Norman J. Watkins,* Deputy Attorney General of Pennsylvania, argued the cause for petitioners. With him on the briefs were *Robert P. Kane,* Attorney General, and *J. Justin Blewitt, Jr.,* Deputy Attorney General.

*Judd F. Crosby* argued the cause and filed a brief for respondents.*

---

*\*William F. Hyland,* Attorney General, *Stephen Skillman,* Assistant Attorney General, and *Erminie L. Conley,* Deputy Attorney General, filed a brief for the State of New Jersey as *amicus curiae* urging reversal.

*David S. Dolowitz, Melvin L. Wulf,* and *Judith M. Mears* filed a brief

440

MR. JUSTICE POWELL delivered the opinion of the Court.

The issue in this case is whether Title XIX of the Social Security Act, as added, 79 Stat. 343, and amended, 42 U. S. C. § 1396 *et seq.* (1970 ed. and Supp. V), requires States that participate in the Medical Assistance (Medicaid) program to fund the cost of nontherapeutic abortions.

I

Title XIX establishes the Medicaid program under which participating States may provide federally funded medical assistance to needy persons.[1] The statute requires participating States to provide qualified individuals with financial assistance in five general categories of medical treatment.[2] 42

for the American Public Health Assn. et al. as *amici curiae* urging affirmance.

*Patricia A. Butler* and *Michael A. Wolff* filed a brief for Jane Doe as *amicus curiae.*

[1] Title XIX establishes two groups of needy persons: (1) the "categorically" needy, which includes needy persons with dependent children and the aged, blind, and disabled, 42 U. S. C. § 1396a (a) (10) (A) (1970 ed., Supp. V); and (2) the "medically" needy, which includes other needy persons, § 1396a (a) (10) (C) (1970 ed., Supp. V). Participating States are not required to extend Medicaid coverage to the "medically" needy, but Pennsylvania has chosen to do so.

[2] The general categories of medical treatment enumerated are:

"(1) inpatient hospital services (other than services in an institution for tuberculosis or mental diseases);

"(2) outpatient hospital services;

"(3) other laboratory and X-ray services;

"(4) (A) skilled nursing facility services (other than services in an institution for tuberculosis or mental diseases) for individuals 21 years of age or older (B) effective July 1, 1969, such early and periodic screening and diagnosis of individuals who are eligible under the plan and are under the age of 21 to ascertain their physical or mental defects, and such health care, treatment, and other measures to correct or ameliorate defects and chronic conditions discovered thereby, as may be provided in regulations of the Secretary; and (C) family planning services and supplies furnished (directly or under arrangements with others) to individuals of child-bearing age (including minors who can be considered to be sexually active)

U. S. C. §§ 1396a (a)(13)(B) (1970 ed., Supp. V), 1396d (a)(1)–(5) (1970 ed. and Supp. V). Although Title XIX does not require States to provide funding for all medical treatment falling within the five general categories, it does require that state Medicaid plans establish "reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives of [Title XIX]." 42 U. S. C. § 1396a (a)(17) (1970 ed., Supp. V).

Respondents, who are eligible for medical assistance under Pennsylvania's federally approved Medicaid plan, were denied financial assistance for desired abortions pursuant to Pennsylvania regulations limiting such assistance to those abortions that are certified by physicians as medically necessary.[3] When

───────────

who are eligible under the State plan and who desire such services and supplies;

"(5) physicians' services furnished by a physician (as defined in section 1395x (r)(1) of this title), whether furnished in the office, the patient's home, a hospital, or a skilled nursing facility, or elsewhere." 42 U. S. C. § 1396d (a) (1970 ed. and Supp. V).

Participating States that elect to extend coverage to the "medically" needy, see n. 1, *supra*, have the option of providing somewhat different categories of medical services to those individuals. 42 U. S. C. § 1396a (a)(13)(C) (ii) (1970 ed., Supp. V).

[3] An abortion is deemed medically necessary under the Pennsylvania Medicaid program if:

"(1) There is documented medical evidence that continuance of the pregnancy may threaten the health of the mother;

"(2) There is documented medical evidence that an infant may be born with incapacitating physical deformity or mental deficiency; or

"(3) There is documented medical evidence that continuance of a pregnancy resulting from legally established statutory or forcible rape or incest, may constitute a threat to the mental or physical health of a patient; and

"(4) Two other physicians chosen because of their recognized professional competency have examined the patient and have concurred in writing; and

"(5) The procedure is performed in a hospital accredited by the Joint

respondents' applications for Medicaid assistance were denied because of their failure to furnish the required certificates, they filed this action in the United States District Court for the Western District of Pennsylvania seeking declaratory and injunctive relief. Their complaint alleged that Pennsylvania's requirement of a certificate of medical necessity contravened relevant provisions of Title XIX and denied them equal protection of the laws in violation of the Fourteenth Amendment.

A three-judge District Court was convened pursuant to 28 U. S. C. § 2281. After resolving the statutory issue against respondents, the District Court held that Pennsylvania's medical-necessity restriction denied respondents equal protection of the laws. *Doe* v. *Wohlgemuth,* 376 F. Supp. 173 (1974).[4]

---

Commission on Accreditation of Hospitals." Brief for Petitioners 4, citing 3 Pennsylvania Bulletin 2207, 2209 (Sept. 29, 1973).

In *Doe* v. *Bolton,* 410 U. S. 179, 192 (1973), this Court indicated that "[w]hether 'an abortion is necessary' is a professional judgment that . . . may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment." We were informed during oral argument that the Pennsylvania definition of medical necessity is broad enough to encompass the factors specified in *Bolton.* Tr. of Oral Arg. 7–8.

The dissent of MR. JUSTICE BRENNAN emphasizes the "key" role of the physician within the Medicaid program, noting that "[t]he Medicaid statutes leave the decision as to the choice among pregnancy procedures exclusively with the doctor and his patient . . . ." *Post,* at 449–450. This is precisely what Pennsylvania has done. Its regulations provide for the funding of abortions upon certification of medical necessity, a determination that the physician is authorized to make on the basis of all relevant factors.

[4] The District Court was of the view that the regulation creates "an unlawful distinction between indigent women who choose to carry their pregnancies to birth, and indigent women who choose to terminate their pregnancies by abortion." 376 F. Supp., at 191. In *Maher* v. *Roe, post,* p. 464, we today conclude that the Equal Protection Clause of the Fourteenth Amendment does not prevent a State from making the policy

Accordingly, the court granted a declaratory judgment that the Pennsylvania requirement was unconstitutional as applied during the first trimester. The United States Court of Appeals for the Third Circuit, sitting en banc, reversed on the statutory issue, holding that Title XIX prohibits participating States from requiring a physician's certificate of medical necessity as a condition for funding during both the first and second trimesters of pregnancy.[5]  523 F. 2d 611 (1975).  The Court of Appeals therefore did not reach the constitutional issue.[6]

We granted certiorari to resolve a conflict among the federal courts as to the requirements of Title XIX.[7]  428 U. S. 909 (1976).

## II

The only question before us is one of statutory construction: whether Title XIX requires Pennsylvania to fund under

choice to fund costs incident to childbirth without providing similar funding for costs incident to nontherapeutic abortions.

[5] Petitioners appealed the District Court's declaratory judgment to the Court of Appeals.  Respondents cross-appealed from the denial of declaratory relief with respect to the second and third trimesters of pregnancy. Since respondents did not seek review of the District Court's denial of injunctive relief, the Court of Appeals had jurisdiction over the appeals. *Gerstein* v. *Coe,* 417 U. S. 279 (1974).

[6] As a result of the decision of the Court of Appeals, petitioners issued a Temporary Revised Policy on September 25, 1975.  This interim policy allows financial assistance for abortions without regard to medical necessity. Brief for Petitioners 3 n. 3.

[7] Two other Courts of Appeals have concluded that the federal statute does not require participating States to fund the cost of nontherapeutic abortions.  *Roe* v. *Norton,* 522 F. 2d 928 (CA2 1975); *Roe* v. *Ferguson,* 515 F. 2d 279 (CA6 1975).  See also, *e. g., Doe* v. *Westby,* 402 F. Supp. 140 (WDSD 1975) (three-judge court) (Title XIX requires funding of nontherapeutic abortions), appeal docketed, No. 75–813; *Doe* v. *Stewart,* Civ. No. 74–3197 (ED La., Jan. 26, 1976) (three-judge court) (Title XIX does not require funding of nontherapeutic abortions), appeal docketed, No. 75–6721.

its Medicaid program the cost of *all* abortions that are permissible under state law. "The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (POWELL, J., concurring). Title XIX makes no reference to abortions, or, for that matter, to any other particular medical procedure. Instead, the statute is cast in terms that require participating States to provide financial assistance with respect to five broad categories of medical treatment. See n. 2, *supra.* But nothing in the statute suggests that participating States are required to fund every medical procedure that falls within the delineated categories of medical care. Indeed, the statute expressly provides:

> "A State plan for medical assistance must . . . include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which . . . are consistent with the objectives of this [Title] . . . ." 42 U. S. C. § 1396a (a)(17) (1970 ed., Supp. V).

This language confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be "reasonable" and "consistent with the objectives" of the Act.[8]

Pennsylvania's regulation comports fully with Title XIX's broadly stated primary objective to enable each State, as far as practicable, to furnish medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services. See 42 U. S. C. §§ 1396, 1396a (10)(C) (1970 ed., Supp. V). Although serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage, it is hardly inconsistent with the objectives of the Act for a State

---

[8] Respondents concede that Title XIX "indicates that the states will have wide discretion in determining the extent of services to be provided." Brief for Respondents 9.

to refuse to fund *unnecessary*—though perhaps desirable—medical services.

The thrust of respondents' argument is that the exclusion of nontherapeutic abortions from Medicaid coverage is unreasonable on both economic and health grounds.[9] The economic argument is grounded on the view that abortion is generally a less expensive medical procedure than childbirth. Since a pregnant woman normally will either have an abortion or carry her child full term, a State that elects not to fund nontherapeutic abortions will eventually be confronted with the greater expenses associated with childbirth. The corresponding health argument is based on the view that an early abortion poses less of a risk to the woman's health than childbirth. Consequently, respondents argue, the economic and health considerations that ordinarily support the reasonableness of state limitations on financing of unnecessary medical services are not applicable to pregnancy.

Accepting respondents' assumptions as accurate, we do not agree that the exclusion of nontherapeutic abortions from Medicaid coverage is unreasonable under Title XIX. As we acknowledged in *Roe* v. *Wade,* 410 U. S. 113 (1973), the State has a valid and important interest in encouraging childbirth. We expressly recognized in *Roe* the "important and legitimate

---

[9] Respondents also contend that Pennsylvania's restriction on coverage is unreasonable within the meaning of Title XIX in that it interferes with the physician's professional judgment concerning appropriate treatment. With one possible exception addressed in Part III, *infra,* the Pennsylvania program does not interfere with the physician's medical judgment concerning his patient's needs. If a physician certifies that an abortion is medically necessary, see n. 3, *supra,* the medical expenses are covered under the Pennsylvania Medicaid program. If, however, the physician concludes that the abortion is not medically necessary, but indicates a willingness to perform the abortion at the patient's request, the expenses are not covered. The decision whether to fund the costs of the abortion thus depends solely on the physician's determination of medical necessity. Respondents point to nothing in the Pennsylvania Medicaid plan that indicates state interference with the physician's initial determination.

interest [of the State] . . . in protecting the potentiality of human life." *Id.*, at 162. That interest alone does not, at least until approximately the third trimester, become sufficiently compelling to justify unduly burdensome state interference with the woman's constitutionally protected privacy interest. But it is a significant state interest existing throughout the course of the woman's pregnancy. Respondents point to nothing in either the language or the legislative history of Title XIX that suggests that it is unreasonable for a participating State to further this unquestionably strong and legitimate interest in encouraging normal childbirth.[10] Absent such a showing, we will not presume that Congress intended to condition a State's participation in the Medicaid program on its willingness to undercut this important interest by subsidizing the costs of nontherapeutic abortions.[11]

[10] Respondents rely heavily on the fact that in amending Title XIX in 1972 to include "family planning services" within the five broad categories of required medical treatment, see n. 2, *supra,* Congress did not expressly *exclude* abortions as a covered service. Since Congress had expressly excluded abortions as a method of family planning services in prior legislation, see 42 U. S. C. § 300a–6, respondents conclude that the failure of Congress to exclude coverage of abortions in the 1972 amendments to Title XIX "strongly indicates" an intention to *require* coverage of abortions. This line of reasoning is flawed. The failure to exclude abortions from coverage indicates only that Congress intended to allow such coverage, not that such coverage is mandatory for nontherapeutic abortions.

[11] The Court of Appeals concluded that Pennsylvania's regulations also violated the equality provisions of Title XIX requiring that an individual's medical assistance "shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." 42 U. S. C. § 1396a (a)(10)(B) (1970 ed., Supp. V). See § 1396a (a)(10) (C) (1970 ed., Supp. V). According to the Court of Appeals, the Pennsylvania regulation "force[s] pregnant women to use the least voluntary method of treatment, while not imposing a similar requirement on other persons who qualify for aid." 523 F. 2d 611, 619 (1975). We find the Pennsylvania regulation to be entirely consistent with the equality provisions of Title XIX. Pennsylvania has simply decided that there is reason-

Our interpretation of the statute is reinforced by two other relevant considerations. First, when Congress passed Title XIX in 1965, nontherapeutic abortions were unlawful in most States.[12] In view of the then-prevailing state law, the contention that Congress intended to require—rather than permit—participating States to fund nontherapeutic abortions requires far more convincing proof than respondents have offered. Second, the Department of Health, Education, and Welfare, the agency charged with the administration of this complicated statute,[13] takes the position that Title XIX allows—but does not mandate—funding for such abortions. "[W]e must be mindful that 'the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . . .' " *New York Dept. of Soc. Services* v. *Dublino,* 413 U. S. 405, 421 (1973), quoting *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 381 (1969). Here, such indications are completely absent.

We therefore hold that Pennsylvania's refusal to extend Medicaid coverage to nontherapeutic abortions is not inconsistent with Title XIX.[14] We make clear, however, that the federal statute leaves a State free to provide such coverage if it so desires.[15]

able justification for excluding from Medicaid coverage a particular medically unnecessary procedure—nontherapeutic abortions.

[12] At the time of our 1973 decision in *Roe,* some eight years after the enactment of Title XIX, at least 30 States had statutory prohibitions against nontherapeutic abortions. 410 U. S. 113, 118 n. 2 (1973).

[13] Federal funds are made available only to those States whose Medicaid plans have been approved by the Secretary of HEW. 42 U. S. C. § 1396 (1970 ed., Supp. V).

[14] Congress by statute has expressly prohibited the use during fiscal year 1977 of federal Medicaid funds for abortions except when the life of the mother would be endangered if the fetus were carried to term. Departments of Labor and Health, Education, and Welfare Appropriation Act, 1977, § 209, Pub. L. 94–439, 90 Stat. 1434.

[15] Our dissenting Brothers, in this case and in *Maher* v. *Roe, post,*

## III

There is one feature of the Pennsylvania Medicaid program, not addressed by the Court of Appeals, that may conflict with Title XIX. Under the Pennsylvania program, financial assistance is not provided for medically necessary abortions unless two physicians in addition to the attending physician have examined the patient and have concurred in writing that the abortion is medically necessary. See n. 3, *supra*. On this record, we are unable to determine the precise role played by these two additional physicians, and consequently we are unable to ascertain whether this requirement interferes with the attending physician's medical judgment in a manner not contemplated by the Congress. The judgment of the Court of Appeals is therefore reversed, and the case is remanded for consideration of this requirement.

*It is so ordered.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL and MR. JUSTICE BLACKMUN join, dissenting.

The Court holds that the "necessary medical services" which Pennsylvania must fund for individuals eligible for

---

p. 482, express in vivid terms their anguish over the perceived impact of today's decisions on indigent pregnant women who prefer abortion to carrying the fetus to childbirth. We think our Brothers misconceive the issues before us, as well as the role of the judiciary.

In these cases we have held merely that (i) the provisions of the Social Security Act do not *require* a State, as a condition of participation, to include the funding of elective abortions in its Medicaid program; and (ii) the Equal Protection Clause does not require a State that elects to fund expenses incident to childbirth also to provide funding for elective abortions. But we leave entirely free both the Federal Government and the States, through the normal processes of democracy, to provide the desired funding. The issues present policy decisions of the widest concern. They should be resolved by the representatives of the people, not by this Court.

Medicaid do not include services connected with elective abortions. I dissent.

Though the question presented by this case is one of statutory interpretation, a difficult constitutional question would be raised where Title XIX of the Social Security Act, as amended, 42 U. S. C. § 1396 *et seq.* (1970 ed. and Supp. V), is read not to require funding of elective abortions. *Maher* v. *Roe, post,* p. 464; *Doe* v. *Bolton,* 410 U. S. 179 (1973); *Roe* v. *Wade,* 410 U. S. 113 (1973). Since the Court should "first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided," *Ashwander* v. *TVA,* 297 U. S. 288, 341, 348 (1936) (Brandeis, J., concurring); see *Westby* v. *Doe,* 420 U. S. 968 (1975), Title XIX, in my view, read fairly in light of the principle of avoidance of unnecessary constitutional decisions, requires agreement with the Court of Appeals that the legislative history of Title XIX and our abortion cases compel the conclusion that elective abortions constitute medically necessary treatment for the condition of pregnancy. I would therefore find that Title XIX requires that Pennsylvania pay the costs of elective abortions for women who are eligible participants in the Medicaid program.

Pregnancy is unquestionably a condition requiring medical services. See *Roe* v. *Norton,* 380 F. Supp. 726, 729 (Conn. 1974); *Klein* v. *Nassau County Medical Center,* 347 F. Supp. 496, 500 (EDNY 1972), vacated for further consideration (in light of *Roe* v. *Wade* and *Doe* v. *Bolton*), 412 U. S. 925 (1973). Treatment for the condition may involve medical procedures for its termination, or medical procedures to bring the pregnancy to term, resulting in a live birth. "[A]bortion and childbirth, when stripped of the sensitive moral arguments surrounding the abortion controversy, are simply two alternative medical methods of dealing with pregnancy . . . ." *Roe* v. *Norton,* 408 F. Supp. 660, 663 n. 3 (Conn. 175). The

Medicaid statutes leave the decision as to choice among pregnancy procedures exclusively with the doctor and his patient, and make no provision whatever for intervention by the State in that decision.   Section 1396a (a)(19) expressly imposes the obligation upon participating States to incorporate safeguards in their programs that assure medical "care and services will be provided, in a manner consistent with . . . the best interests of the recipients."   And, significantly, the Senate Finance Committee Report on the Medicaid bill expressly stated that the "physician is to be the key figure in determining utilization of health services."   S. Rep. No. 404, 89th Cong., 1st Sess., 46 (1965).   Thus the very heart of the congressional scheme is that the physician and patient should have complete freedom to choose those medical procedures for a given condition which are best suited to the needs of the patient.

The Court's original abortion decisions dovetail precisely with the congressional purpose under Medicaid to avoid interference with the decision of the woman and her physician. *Roe* v. *Wade, supra,* at 163, held that "[t]he attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated." And *Doe* v. *Bolton, supra,* at 192, held that "the medical judgment may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age— relevant to the well-being of the patient.   All these factors may relate to health.   This allows the attending physician the room he needs to make his best medical judgment.   And it is room that operates for the benefit, not the disadvantage, of the pregnant woman."*   Once medical treatment of some

---

*The Court states, *ante,* at 442 n. 3, that Pennsylvania has left the abortion decision to the patient and her physician in the manner prescribed in *Doe* v. *Bolton.*   Pennsylvania indeed does allow the attending physician to provide a certificate of medical necessity "on the basis of all relevant factors," *ante,* at 442 n. 3, but Pennsylvania's concept of relevance does not extend far enough to permit doctors freely to provide certificates

sort is necessary, Title XIX does not dictate what that treatment should be. In the face of Title XIX's emphasis upon the joint autonomy of the physician and his patient in the decision of how to treat the condition of pregnancy, it is beyond comprehension how treatment for therapeutic abortions and live births constitutes "necessary medical services" under Title XIX, but that for elective abortions does not.

If Pennsylvania is not obligated to fund medical services rendered in performing elective abortions because they are not "necessary" within the meaning of 42 U. S. C. § 1396 (1970 ed., Supp. V), it must follow that Pennsylvania also would not violate the statute if it refused to fund medical services for "therapeutic" abortions or live births. For if the

---

of medical necessity for all elective abortions. At oral argument, counsel for petitioners carefully stated the State's position as follows:

"[L]et me make perfectly clear my concession. That is, that a physician, in examining a patient, may take psychological, physical, emotional, familial considerations into mind and in the light of those considerations, may determine if those factors affect the health of the mother to such an extent as he would deem an abortion necessary.

"I think the key in the *Bolton* language, and the key in the *Vuitch* [*United States* v. *Vuitch,* 402 U. S. 62 (1971)] language is the fact that the physician, using all of these facts—and there are probably more that he should use—must determine if the woman's health—that is, her physical or psychological health—is jeopardized by the condition of pregnancy.

"That is not to say, obviously, as I believe the Plaintiffs are asserting, that the fact that the family is going to increase makes an abortion medically necessary." Tr. of Oral Arg. 8.

Petitioners' "concession" only goes so far as to permit an attending physician to consider an abortion as it relates to a woman's health. *Bolton* recognized that the factors considered by a physician "*may* relate to health," but in the very same paragraph made clear that those factors were more broadly directed to the "well-being" of the woman. 410 U. S., at 192 (emphasis added). While the right to privacy does implicate health considerations, the constitutional right recognized and protected by the Court's abortion decisions is the "right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt* v. *Baird,* 405 U. S. 438, 453 (1972).

availability of therapeutic abortions and live births makes elective abortions "unnecessary," the converse must also be true. This highlights the violence done the congressional mandate by today's decision. If the State must pay the costs of therapeutic abortions and of live birth as constituting medically necessary responses to the condition of pregnancy, it must, under the command of § 1396, also pay the costs of elective abortions; the procedures in each case constitute necessary medical treatment for the condition of pregnancy.

The 1972 family-planning amendment to the Act, 42 U. S. C. § 1396d (a)(4)(C) (1970 ed., Supp. V), buttresses my conclusion that the Court's construction frustrates the objectives of the Medicaid program. Section 1396 (2) states that an explicit purpose of Medicaid is to assist eligible indigent recipients to "attain or retain capability for independence or self-care." The 1972 amendment furthered this objective by assisting those who "desire to control family size in order to enhance their capacity and ability to seek employment and better meet family needs." S. Rep. No. 92–1230, p. 297 (1972). Though far less than an ideal family-planning mechanism, elective abortions are one method for limiting family size and avoiding the financial and emotional problems that are the daily lot of the impoverished. See Special Subcommittee on Human Resources of the Senate Committee on Labor and Public Welfare, 92d Cong., 1st Sess., Report of the Secretary of Health, Education, and Welfare Submitting Five-Year Plan for Family Planning Services and Population Research Programs 319 (Comm. Print 1971).

It is no answer that abortions were illegal in 1965 when Medicaid was enacted, and in 1972 when the family-planning amendment was adopted. Medicaid deals with general categories of medical services, not with specific procedures, and nothing in the statute even suggests that Medicaid is designed to assist in payment for only those medical services that were

legally permissible in 1965 and 1972. I fully agree with the Court of Appeals statement:

> "It is impossible to believe that in enacting Title XIX Congress intended to freeze the medical services available to recipients at those which were legal in 1965. Congress surely intended Medicaid to pay for drugs not legally marketable under the FDA's regulations in 1965 which are subsequently found to be marketable. We can see no reason why the same analysis should not apply to the Supreme Court's legalization of elective abortion in 1973." 523 F. 2d 611, 622–623 (1975).

Nor is the administrative interpretation of the Department of Health, Education, and Welfare that funding of elective abortions is permissible but not mandatory dispositive of the construction of "necessary medical services." The principle of according weight to agency interpretation is inapplicable when a departmental interpretation, as here, is patently inconsistent with the controlling statute. *Townsend* v. *Swank,* 404 U. S. 282, 286 (1971).

Finally, there is certainly no affirmative policy justification of the State that aids the Court's construction of "necessary medical services" as not including medical services rendered in performing elective abortions. The State cannot contend that it protects its fiscal interests in not funding elective abortions when it incurs far greater expense in paying for the more costly medical services performed in carrying pregnancies to term, and, after birth, paying the increased welfare bill incurred to support the mother and child. Nor can the State contend that it protects the mother's health by discouraging an abortion, for not only may Pennsylvania's exclusion force the pregnant woman to use of measures dangerous to her life and health but, as *Roe* v. *Wade,* 410 U. S., at 149, concluded, elective abortions by competent licensed physicians are now "relatively safe" and the risks to women

undergoing abortions by such means "appear to be as low as or lower than . . . for normal childbirth."

The Court's construction can only result as a practical matter in forcing penniless pregnant women to have children they would not have borne if the State had not weighted the scales to make their choice to have abortions substantially more onerous. Indeed, as the Court said only last Term: "For a doctor who cannot afford to work for nothing, and a woman who cannot afford to pay him, the State's refusal to fund an abortion is as effective an 'interdiction' of it as would ever be necessary." *Singleton* v. *Wulff*, 428 U. S. 106, 118–119, n. 7 (1976). The Court's construction thus makes a mockery of the congressional mandate that States provide "care and services . . . in a manner consistent with . . . the best interests of the recipients." We should respect the congressional plan by construing § 1396 as requiring States to pay the costs of the "necessary medical services" rendered in performing elective abortions, chosen by physicians and their women patients who participate in Medicaid as the appropriate treatment for their pregnancies.

The Court does not address the question whether the provision requiring the concurrence in writing of two physicians in addition to the attending physician conflicts with Title XIX. I would hold that the provision is invalid as clearly in conflict with Title XIX under my view of the paramount role played by the attending physician in the abortion decision, and in any event is constitutionally invalid under *Doe* v. *Bolton*, 410 U. S., at 198–200.

I would affirm the judgment of the Court of Appeals.

MR. JUSTICE MARSHALL, dissenting.*

It is all too obvious that the governmental actions in these cases, ostensibly taken to "encourage" women to carry preg-

---

*[This opinion applies also to No. 75–1440, *Maher, Commissioner of Social Services of Connecticut* v. *Roe et al., post,* p. 464, and No. 75–442, *Poelker, Mayor of St. Louis, et al.* v. *Doe, post,* p. 519.]

nancies to term, are in reality intended to impose a moral viewpoint that no State may constitutionally enforce. *Roe* v. *Wade,* 410 U. S. 113 (1973); *Doe* v. *Bolton,* 410 U. S. 179 (1973). Since efforts to overturn those decisions have been unsuccessful, the opponents of abortion have attempted every imaginable means to circumvent the commands of the Constitution and impose their moral choices upon the rest of society. See, *e. g., Planned Parenthood of Missouri* v. *Danforth,* 428 U. S. 52 (1976); *Singleton* v. *Wulff,* 428 U. S. 106 (1976); *Bellotti* v. *Baird,* 428 U. S. 132 (1976). The present cases involve the most vicious attacks yet devised. The impact of the regulations here falls tragically upon those among us least able to help or defend themselves. As the Court well knows, these regulations inevitably will have the practical effect of preventing nearly all poor women from obtaining safe and legal abortions.[1]

---

[1] Although an abortion performed during the first trimester of pregnancy is a relatively inexpensive surgical procedure, usually costing under $200, even this modest sum is far beyond the means of most Medicaid recipients. And "if one does not have it and is unable to get it the fee might as well be" one hundred times as great. *Smith* v. *Bennett,* 365 U. S. 708, 712 (1961).

Even before today's decisions, a major reason that perhaps as much as one-third of the annual need for an estimated 1.8 million abortions went unmet was the fact that 8 out of 10 American counties did not have a single abortion provider. Sullivan, Tietze, & Dryfoos, Legal Abortion in the United States, 1975–1976, 9 Family Planning Perspectives 116–117, 121, 129 (1977). In 1975, 83,000 women had to travel from their home States to obtain abortions (there were 100 abortions performed in West Virginia and 310 in Mississippi), and about 300,000 more, or a total of nearly 40% of abortion patients, had to seek help outside their home counties. *Id.,* at 116, 121, 124. In addition, only 18% of the public hospitals in the Nation performed even a single abortion in 1975 and in 10 States not one public hospital provided abortion services. *Id.,* at 121, 128.

Given the political realities, it seems inevitable that the number and geographical distribution of abortion providers will diminish as a result of today's decisions. It is regrettable but likely that fewer public hospitals will provide the service and if Medicaid payments are unavailable, other

The enactments challenged here brutally coerce poor women to bear children whom society will scorn for every day of their lives. Many thousands of unwanted minority and mixed-race children now spend blighted lives in foster homes, orphanages, and "reform" schools. Cf. *Smith v. Organization of Foster Families,* 431 U. S. 816 (1977). Many children of the poor, sadly, will attend second-rate segregated schools. Cf. *Milliken v. Bradley,* 418 U. S. 717 (1974). And opposition remains strong against increasing Aid to Families With Dependent Children benefits for impoverished mothers and children, so that there is little chance for the children to grow up in a decent environment. Cf. *Dandridge v. Williams,* 397 U. S. 471 (1970). I am appalled at the ethical bankruptcy of those who preach a "right to life" that means, under present social policies, a bare

---

hospitals, clinics, and physicians will be unable to do so. Since most Medicaid and public hospital patients probably do not have the money, the time, or the familiarity with the medical delivery system to travel to distant States or cities where abortions are available, today's decisions will put safe and legal abortions beyond their reach. The inevitable human tragedy that will result is reflected in a Government report:

"[F]or some women, the lack of public funding for legal abortion acted as a deterrent to their obtaining the safer procedures. The following case history [of a death which occurred during 1975] exemplifies such a situation:

". . . A 41-year-old married woman with a history of 6 previous pregnancies, 5 living children, and 1 previous abortion sought an illegal abortion from a local dietician. Her stated reason for seeking an illegal procedure was financial, since Medicaid in her state of residence would not pay for her abortion. The illegal procedure cost $30, compared with an estimated $150 for a legal procedure . . . . Allegedly the operation was performed by inserting a metal rod to dilate the cervix . . . . [The woman died of cardiac arrest after two weeks of intensive hospital care and two operations.]" U. S. Dept. of Health, Education, and Welfare, Center for Disease Control, Abortion Surveillance, 1975, p. 9 (1977) (hereafter CDC Surveillance).

existence in utter misery for so many poor women and their children.

## I

The Court's insensitivity to the human dimension of these decisions is particularly obvious in its cursory discussion of appellees' equal protection claims in *Maher* v. *Roe*. That case points up once again the need for this Court to repudiate its outdated and intellectually disingenuous "two-tier" equal protection analysis. See generally *Massachusetts Bd. of Retirement* v. *Murgia*, 427 U. S. 307, 317 (1976) (MARSHALL, J., dissenting). As I have suggested before, this "model's two fixed modes of analysis, strict scrutiny and mere rationality, simply do not describe the inquiry the Court has undertaken—or should undertake—in equal protection cases." *Id.*, at 318. In the present case, in its evident desire to avoid strict scrutiny—or indeed any meaningful scrutiny— of the challenged legislation, which would almost surely result in its invalidation, see *id.*, at 319, the Court pulls from thin air a distinction between laws that absolutely prevent exercise of the fundamental right to abortion and those that "merely" make its exercise difficult for some people. See *Maher* v. *Roe, post,* at 471–474. MR. JUSTICE BRENNAN demonstrates that our cases support no such distinction, *post,* at 485–489, and I have argued above that the challenged regulations are little different from a total prohibition from the viewpoint of the poor. But the Court's legal legerdemain has produced the desired result: A fundamental right is no longer at stake and mere rationality becomes the appropriate mode of analysis. To no one's surprise, application of that test—combined with misreading of *Roe* v. *Wade* to generate a "strong" state interest in "potential life" during the first trimester of pregnancy, see *infra,* at 460; *Maher* v. *Roe, post,* at 489–490 (BRENNAN, J., dissenting); *post,* at 462 (BLACKMUN, J., dissenting)—"leaves little doubt about the

outcome; the challenged legislation is [as] always upheld." *Massachusetts Bd. of Retirement* v. *Murgia, supra,* at 319. And once again, "relevant factors [are] misapplied or ignored," 427 U. S., at 321, while the Court "forgo[es] all judicial protection against discriminatory legislation bearing upon" a right "vital to the flourishing of a free society" and a class "unfairly burdened by invidious discrimination unrelated to the individual worth of [its] members." *Id.,* at 320.

As I have argued before, an equal protection analysis far more in keeping with the actions rather than the words of the Court, see *id.,* at 320–321, carefully weighs three factors—"the importance of the governmental benefits denied,. the character of the class, and the asserted state interests," *id.,* at 322. Application of this standard would invalidate the challenged regulations.

The governmental benefits at issue here, while perhaps not representing large amounts of money for any individual, are nevertheless of absolutely vital importance in the lives of the recipients. The right of every woman to choose whether to bear a child is, as *Roe* v. *Wade* held, of fundamental importance. An unwanted child may be disruptive and destructive of the life of any woman, but the impact is felt most by those too poor to ameliorate those effects. If funds for an abortion are unavailable, a poor woman may feel that she is forced to obtain an illegal abortion that poses a serious threat to her health and even her life. See n. 1, *supra.* If she refuses to take this risk, and undergoes the pain and danger of state-financed pregnancy and childbirth, she may well give up all chance of escaping the cycle of poverty. Absent day-care facilities, she will be forced into full-time child care for years to come; she will be unable to work so that her family can break out of the welfare system or the lowest income brackets. If she already has children, another infant to feed and clothe may well stretch the budget past the breaking point. All

chance to control the direction of her own life will have been lost.

I have already adverted to some of the characteristics of the class burdened by these regulations. While poverty alone does not entitle a class to claim government benefits, it is surely a relevant factor in the present inquiry. See *San Antonio School Dist.* v. *Rodriguez*, 411 U. S. 1, 70, 117–124 (1973) (MARSHALL, J., dissenting). Indeed, it was in the *San Antonio* case that MR. JUSTICE POWELL for the Court stated a test for analyzing discrimination on the basis of wealth that would, if fairly applied here, strike down the regulations. The Court there held that a wealth-discrimination claim is made out by persons who share "two distinguishing characteristics: because of their impecunity they [are] completely unable to pay for some desired benefit, and as a consequence, they sustai[n] an absolute deprivation of a meaningful opportunity to enjoy that benefit." *Id.*, at 20. Medicaid recipients are, almost by definition, "completely unable to pay for" abortions, and are thereby completely denied "a meaningful opportunity" to obtain them.[2]

It is no less disturbing that the effect of the challenged regulations will fall with great disparity upon women of minority races. Nonwhite women now obtain abortions at nearly twice the rate of whites,[3] and it appears that almost

---

[2] If public funds and facilities for abortions are sharply reduced, private charities, hospitals, clinics, and doctors willing to perform abortions for far less than the prevailing fee will, I trust, accommodate some of the need. But since abortion services are inadequately available even now, see n. 1, *supra*, such private generosity is unlikely to give many poor women "a meaningful opportunity" to obtain abortions.

[3] Blacks and other nonwhite groups are heavily overrepresented among both abortion patients and Medicaid recipients. In 1975, about 13.1% of the population was nonwhite, Statistical Abstract of the United States, 1976, p. 25, yet 31% of women obtaining abortions were of a minority race. CDC Surveillance 2 and 24, Table 8. Furthermore, nonwhites

40% of minority women—more than five times the proportion of whites—are dependent upon Medicaid for their health care.[4] Even if this strongly disparate racial impact does not alone violate the Equal Protection Clause, see *Washington* v. *Davis*, 426 U. S. 229 (1976); *Jefferson* v. *Hackney*, 406 U. S. 535 (1972), "at some point a showing that state action has a devastating impact on the lives of minority racial groups must be relevant." *Id.*, at 558, 575–576 (MARSHALL, J., dissenting).

Against the brutal effect that the challenged laws will have must be weighed the asserted state interest. The Court describes this as a "strong interest in protecting the potential life of the fetus." *Maher* v. *Roe, post,* at 478. Yet in *Doe* v. *Bolton, supra,* the Court expressly held that any state interest during the first trimester of pregnancy, when 86% of all abortions occur, CDC Surveillance 3, was wholly insufficient to justify state interference with the right to abortion.

---

secured abortions at the rate of 476 per 1,000 live births, while the corresponding figure for whites was only 277. *Id.*, at 2, and Tables 8, 9. Abortion is thus a family-planning method of considerably more significance for minority groups than for whites.

[4] Although complete statistics are unavailable (three States, Puerto Rico, and the Virgin Islands having furnished no racial breakdown, and eight States giving incomplete data), nonwhites accounted for some 43.4% of Medicaid recipients during fiscal year 1974 in jurisdictions reporting. U. S. Dept. of HEW, National Center for Social Statistics, Medicaid Recipient Characteristics and Units of Selected Medical Services, Fiscal Year 1974, p. 2 (Feb. 1977). Extrapolating this percentage to cover the entire Medicaid caseload of over 17.6 million, minority racial groups would account for 7,656,000 recipients. Assuming comparability of the HEW and census figures, this amounts to 27.4% of the Nation's nonwhite population. See Statistical Abstract, *supra,* n. 3, at 25. Since there are 1.8 female Medicaid recipients for every male, see Medicaid Recipient Characteristics, *supra,* the proportion of nonwhite women who must rely upon Medicaid is probably far higher, about 38.5%. The comparable figure for white women appears to be about 7%.

410 U. S., at 192–200.[5] If a State's interest in potential human life before the point of viability is insufficient to justify requiring several physicians' concurrence for an abortion, *ibid.,* I cannot comprehend how it magically becomes adequate to allow the present infringement on rights of disfavored classes. If there is any state interest in potential life before the point of viability, it certainly does not outweigh the deprivation or serious discouragement of a vital constitutional right of especial importance to poor and minority women.[6]

Thus, taking account of all relevant factors under the flexible standard of equal protection review, I would hold the Connecticut and Pennsylvania Medicaid regulations and the St. Louis public hospital policy violative of the Fourteenth Amendment.

## II

When this Court decided *Roe* v. *Wade* and *Doe* v. *Bolton,* it properly embarked on a course of constitutional adjudication no less controversial than that begun by *Brown* v. *Board of Education,* 347 U. S. 483 (1954). The abortion decisions are sound law and undoubtedly good policy. They have never been questioned by the Court, and we are told that today's cases "signa[l] no retreat from *Roe* or the cases applying it." *Maher* v. *Roe, post,* at 475. The logic of those cases inexorably requires invalidation of the present enact-

---

[5] Requirements that the abortion be performed by a physician exercising his best clinical judgment, and in a facility meeting narrowly tailored health standards, are allowable. *Doe* v. *Bolton,* 410 U. S., at 192–200.

[6] Application of the flexible equal protection standard would allow the Court to strike down the regulations in these cases without calling into question laws funding public education or English language teaching in public schools. See *Maher* v. *Roe, post,* at 476–477. By permitting a court to weigh all relevant factors, the flexible standard does not logically require acceptance of any equal protection claim that is "identical in principle" under the traditional approach to those advanced here. See *Maher, post,* at 477.

ments.  Yet I fear that the Court's decisions will be an invitation to public officials, already under extraordinary pressure from well-financed and carefully orchestrated lobbying campaigns, to approve more such restrictions.  The effect will be to relegate millions of people to lives of poverty and despair.  When elected leaders cower before public pressure, this Court, more than ever, must not shirk its duty to enforce the Constitution for the benefit of the poor and powerless.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.*

The Court today, by its decisions in these cases, allows the States, and such municipalities as choose to do so, to accomplish indirectly what the Court in *Roe* v. *Wade,* 410 U. S. 113 (1973), and *Doe* v. *Bolton,* 410 U. S. 179 (1973)— by a substantial majority and with some emphasis, I had thought—said they could not do directly.  The Court concedes the existence of a constitutional right but denies the realization and enjoyment of that right on the ground that existence and realization are separate and distinct.  For the individual woman concerned, indigent and financially helpless, as the Court's opinions in the three cases concede her to be, the result is punitive and tragic.  Implicit in the Court's holdings is the condescension that she may go elsewhere for her abortion.  I find that disingenuous and alarming, almost reminiscent of: "Let them eat cake."

The result the Court reaches is particularly distressing in *Poelker* v. *Doe, post,* p. 519, where a presumed majority, in electing as mayor one whom the record shows campaigned on the issue of closing public hospitals to nontherapeutic abortions, punitively impresses upon a needy minority its own

---

*[This opinion applies also to No. 75–1440, *Maher, Commissioner of Social Services of Connecticut* v. *Roe et al., post,* p. 464, and No. 75–442, *Poelker, Mayor of St. Louis, et al.* v. *Doe, post,* p. 519.]

concepts of the socially desirable, the publicly acceptable, and the morally sound, with a touch of the devil-take-the-hindmost. This is not the kind of thing for which our Constitution stands.

The Court's financial argument, of course, is specious. To be sure, welfare funds are limited and welfare must be spread perhaps as best meets the community's concept of its needs. But the cost of a nontherapeutic abortion is far less than the cost of maternity care and delivery, and holds no comparison whatsoever with the welfare costs that will burden the State for the new indigents and their support in the long, long years ahead.

Neither is it an acceptable answer, as the Court well knows, to say that the Congress and the States are free to authorize the use of funds for nontherapeutic abortions. Why should any politician incur the demonstrated wrath and noise of the abortion opponents when mere silence and nonactivity accomplish the results the opponents want?

There is another world "out there," the existence of which the Court, I suspect, either chooses to ignore or fears to recognize. And so the cancer of poverty will continue to grow. This is a sad day for those who regard the Constitution as a force that would serve justice to all evenhandedly and, in so doing, would better the lot of the poorest among us.