FAMILY LIFE LEAGUE *et al.*, Plaintiffs-Appellants, v. THE DEPART-
MENT OF PUBLIC AID *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 82—651

Opinion filed April 10, 1985.—Rehearing denied June 4, 1985.

McNAMARA, J., dissenting.

Winston & Strawn, of Chicago (Clavin Sawyier, James Fletcher, and An-
drew Tecson, of counsel), for appellant Illinois State Medical Society.

William J. Harte, Ltd., of Chicago (William J. Harte and David J.
Walker, of counsel), for other appellants.

Neil F. Hartigan, Attorney General, of Springfield (James C. O'Connell
and Barbara Yong, Special Assistant Attorneys General, of Chicago, of coun-
sel), for appellees.

Sonnenschein, Carlin, Nath & Rosenthal, of Chicago (Alan Gilbert, Penny Parker, Jeffrey Hornstein, and Lois Lipton, of counsel), for *amicus curiae* Roger Baldwin Foundation of ACLU, Inc.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiffs Family Life League, a not-for-profit corporation, its president, John Kelly, its executive director, Joan Solms, and Family Life League Educational Association, a not-for-profit corporation, brought this action for *mandamus* against defendants Illinois Department of Public Aid and its director, Jeffrey Miller. Plaintiffs sought an order that defendants make available to them defendants' records relating to the use of public funds paid to doctors and medical providers for welfare abortions and abortion-related services. Plaintiffs claimed entitlement to this information under the State Records Act (Ill. Rev. Stat. 1979, ch. 116, par. 43.4 *et seq.*). In their answer, defendants denied that they were required to disclose the information. On appeal, defendants contend that disclosure would impermissibly intrude upon the expected privacy rights of welfare recipients having abortions and the rights of doctors and providers of welfare abortions, and that it would compel defendants to create a new record not required by law.

Defendants are responsible for the disbursal of funds under the State's medical assistance programs. Payments are made to individuals and entities that provide medical services for recipients, people who lack sufficient income and resources to pay for the medical services and who otherwise meet the prerequisites for receiving these services. Under restricted circumstances, defendants pay doctors and providers for performing abortions and abortion-related services.[1]

Defendants make and keep records regarding their payments. Included in these records are the identities of health care providers and doctors, and the amount of public funds paid to them for their services. Relying on the State Records Act,[2] plaintiffs, opponents of abortion, requested defendants on various occasions to provide them

---

[1] In Illinois, defendants will authorize payment for abortions only if "in the opinion of a physician, such procedures are necessary for the preservation of the life of the woman seeking such treatment ***." Ill. Ann. Stat., ch. 23, par. 5—5(17) (Smith-Hurd 1984-85 Supp.).

[2] The State Records Act provides that "[r]eports and records of the obligation, receipt and use of public funds of the State are public records available for inspection by the public." (Ill. Rev. Stat. 1979, ch. 116, par. 43.6.) However, the same section of the statute also provides that "[n]othing in this Section shall require the State to invade or assist in the invasion of any person's right to privacy."

with access to defendants' records relating to abortions. In particular, plaintiffs sought to learn the identities of the doctors and providers of abortions, the number of claims made by each doctor and provider for abortions, and the amount of funds used to pay each doctor and provider for these services. Defendants denied plaintiffs access to this information, but offered to provide records that show (1) the number of welfare abortions for which defendants paid during a calendar or fiscal year, (2) the total monies defendants paid for welfare abortion services and (3) the names of all providers participating in defendants' general medical programs and total amounts paid them during each year without distinguishing doctors, providers or monies related to welfare abortions.

Plaintiffs moved for judgment on the pleadings. The trial court granted the motion in part and denied it in part. The court ordered defendants to provide plaintiffs with the names and addresses of the doctors and providers of welfare abortions, but further ordered that defendants were not required to provide records as to the number of welfare abortions performed by each doctor or provider or the amount of payments made to them for performing the welfare abortions. Plaintiffs appeal, and defendants cross-appeal those portions of the judgment adverse to their respective positions. The Illinois State Medical Society was permitted to intervene as a cross-appellant. Also, the Roger Baldwin Foundation of the ACLU, Inc., was allowed to file an *amicus curiae* brief. We reverse and remand.

The decision in this case requires a delicate balance between two competing rights: (1) the statutory right of the people to full and complete disclosure regarding the affairs of their government and (2) the constitutionally protected right of individuals to privacy in regard to their personal affairs which is inherent in the Bill of Rights[3] and which is expressly provided for in our Illinois Constitution.[4] Plainly, neither right can be subjugated to the other right without doing violence to the precepts vital to a free society.

In *Roe v. Wade*, the Supreme Court held that there is a constitutional right of privacy which encompasses a woman's decision whether to have an abortion. (*Roe v. Wade* (1973), 410 U.S. 113, 153, 35 L. Ed. 2d 147, 177, 93 S. Ct. 705, 727.) Plainly, this right of privacy includes

---

[3]Specific guarantees in the Bill of Rights have penumbras, one of which is the right of privacy. *Griswold v. Connecticut* (1965), 381 U.S. 479, 484, 14 L. Ed. 2d 510, 514-15, 85 S. Ct. 1678, 1681; see *Roe v. Wade* (1973), 410 U.S. 113, 152, 35 L. Ed. 2d 147, 176, 93 S. Ct. 705, 726.

[4]The Illinois Constitution provides: "The people shall have the right to be secure *** against *** invasions of privacy." Ill. Const. 1970, art. 1, sec. 6.

the ability to give effect to that right, and the right extends to all women, including those on welfare. Thus, the privacy issue that is involved in this case centers on the effect that disclosure of the information sought by plaintiffs would have on the right of welfare recipients to make and effectuate their abortion decisions.

██ Plaintiffs argue that the welfare recipients' right of privacy is not involved because they do not seek the names of the recipients. We believe that plaintiffs' perspective of the issue is unrealistic and far too constricted. Privacy rights involve different kinds of interests. Obviously, one interest concerns avoiding the disclosure of personal matters. However, another interest involves a woman's freedom to make a decision to have an abortion and to be able to effectuate that decision. (See *Whalen v. Roe* (1977), 429 U.S. 589, 599-600, 51 L. Ed. 2d 64, 73, 97 S. Ct. 869, 876.) This interest includes not only the private relationship between a woman and her physician (*Roe v. Wade* (1973), 410 U.S. 113, 153, 35 L. Ed. 2d 147, 177, 93 S. Ct. 705, 727), but also the need of the physician to freely practice medicine and perform legal abortions without arbitrary outside restraints (see *Nyberg v. City of Virginia* (8th Cir. 1974), 495 F.2d 1342, 1344). This is true because the abortion decisions of women and the ability of women to effectuate their decisions are necessarily dependent upon and intertwined with the responsibilities and decisions of their physicians. See *City of Akron v. Akron Center for Reproductive Health, Inc.* (1983), 462 U.S. 416, 430-31, 76 L. Ed. 2d 687, 703, 103 S. Ct. 2481, 2493; *Planned Parenthood of Central Missouri v. Danforth* (1976), 428 U.S. 52, 61, 49 L. Ed. 2d 788, 800, 96 S. Ct. 2831, 2837; *Roe v. Wade* (1973), 410 U.S. 113, 153, 35 L. Ed. 2d 147, 177, 93 S. Ct. 705, 727.

Accordingly, if physicians are unable or unwilling to perform legal abortions for welfare recipients because of arbitrary outside restraints, welfare recipients would not be able to give effect to their constitutional right of privacy to obtain an abortion within the ambit of *Roe v. Wade*. Recognition of this reality is a significant consideration here. In our present social climate of dangerous emotional highs on both sides of the abortion issue, it can hardly be denied that the insidious threat of harassment and harm to physicians performing legal abortions and the terrorism of abortion clinics by antiabortion vigilante groups are very real.[5] Given these circumstances, it is reasonable to conclude that physicians would simply be unwilling to be a part of the abortion decisions of women on welfare if there is compelled disclosure of the information sought by plaintiffs. Thus, we be-

---

[5]See Appendix.

lieve that compelling disclosure of the information sought by plaintiffs would severely impact the ability of welfare recipients to effectuate their abortion decisions, which in turn would violate the women's constitutional right of privacy as stated in *Roe v. Wade.*

■ We therefore conclude that although plaintiffs do not seek the names of the welfare recipients receiving abortions, compelling disclosure of the physicians and providers that perform abortion services for welfare recipients would invade the welfare recipients' constitutional right of privacy to make and effectuate their abortion decisions. Thus, while we are dealing with a praiseworthy statute requiring complete disclosure regarding the affairs of government, in this rare instance the disclosure provisions of the statute must yield to the constitutionally protected privacy right of women on welfare to make and effectuate their abortion decisions.

■ We next address defendants' argument that they need not disclose the information sought by plaintiffs because the statute does not require defendants to create a new record, which defendants claim they would be required to do in order to accede to plaintiffs' request. In their answer, defendants state that they have "kept records for each medical service for the years 1978 through 1980 in electronic form and for 1976 and 1977 on microfilm or microfiche, but that upon such records abortion services are not listed separately from other medical services, and that to separate the abortion services would require that special computer programs be written and/or separate records produced." Defendants admit that they regularly produce a list which shows the names of recipients of abortions, the names of providers and the amounts paid. Finally, at oral argument, defendants candidly admitted that they have the ability to create records that contain only the information sought by plaintiffs.

Under the circumstances, we reject defendants' contention that because they maintain no records which contain only the information sought by plaintiffs, plaintiffs' request must be denied on that basis. Acceptance of defendants' contention would effectively gut the State Records Act and the Freedom of Information Act.[6] Plainly, these acts

---

[6]Beginning July 1, 1984, the provisions of sections 3 and 4 of the State Records Act which relate to the inspection and copying of records apply only as to records and reports prepared or received prior to that date. Records and reports prepared and received on or after July 1, 1984, are covered under the provisions of the Freedom of Information Act. Ill. Ann. Stat., ch. 116, par. 43.29 (Smith-Hurd 1984-85 Supp.).

Section 1 of the Freedom of Information Act states: "Pursuant to the fundamental philosophy of the American constitutional form of government, it is declared to be

imply that the agency has a duty to delete confidential and nondisclosable information from that which may be disclosed in order to carry out the Acts' purpose of making available for public inspection all disclosable parts of the public record. Otherwise, any record which an agency is required by law to keep could be rendered inaccessible to public scrutiny by the inclusion of confidential material. Thus, we conclude that the disclosure of information sought, either by deleting confidential information from the existing record or by extracting the requested information therefrom, does not require the "creation" of a new public record. See *State ex rel. Stephan v. Harder* (1982), 230 Kan. 573, 583, 641 P.2d 366, 374.

Defendants raise other issues which we address summarily because we believe they are plainly without merit. Defendants contend that they have a defense to plaintiffs' action because the possibility of inadvertent disclosure of recipients' names could have a chilling effect on a woman's decision to seek an abortion. Also, defendants contend that they have a defense to plaintiffs' action because disclosure of the amount of monies doctors and providers receive for performing abortions would interfere with the doctors' and providers' right to privacy because they have a right not to have their professional and business dealings made public. Defendants contend that doctors are not elected officials and are not in the public domain, but rather, they merely provide a service. We believe that all of these contentions and arguments are simply untenable.

Accordingly, we conclude that defendants' pleadings raise a legally sufficient defense which prevents the issuance of a writ of *mandamus* and the entry of judgment on the pleadings in favor of plaintiffs. The judgment entered in the trial court is therefore reversed, and the case is remanded for further proceedings consistent with what is stated in this opinion. In reaching our conclusion, we specifically point out that it is solely the unique circumstances that are involved here which re-

the public policy of the State of Illinois that all persons are entitled to full and complete information regarding the affairs of government and the official acts and policies of those who represent them as public officials and public employees consistent with the terms of this Act. Such access is necessary to enable the people to fulfill their duties of discussing public issues fully and freely, making informed political judgments and monitoring government to ensure that it is being conducted in the public interest.

This Act is not intended to be used to violate individual privacy, nor for the purpose of furthering a commercial enterprise, or to disrupt the duly-undertaken work of any public body independent of the fulfillment of any of the fore-mentioned rights of the people to access to information." Ill. Ann. Stat., ch. 116, par. 201 (Smith-Hurd 1984-85 Supp., eff. July 1, 1984).

quire the conclusion we have reached, and we do not intend our conclusion to be interpreted in any way to serve as precedent to otherwise diminish or restrict the State Records Act or the Freedom of Information Act.

Reversed and remanded.

WHITE, P.J., concurs.

### APPENDIX

See Gratteau & Sarrio, *Abortion clinics tighten security. Chance of violence increases as protesters become bolder*, Chicago Tribune, Jan. 20, 1985, Chicagoland, at 1; *Three charged in bombings at abortion clinics*, Chicago Sun-Times, Jan. 20, 1985, at 26; Maclean, *Bishops hit attacks on abortion clinics*, Chicago Tribune, Jan. 17, 1985, sec. 1, at 2 ("Joseph Cardinal Bernardin of Chicago, speaking on behalf of the nation's Roman Catholic bishops, Wednesday condemned the recent wave of abortion-clinic bombings and called them 'dangerous, ill-considered and deplorable.' "); *Reagan assails abortion-clinic attacks*, Chicago Tribune, Jan. 4, 1985, sec. 1, at 3; *Blast rips abortion clinic*, Chicago Sun-Times, Jan. 2, 1985, at 16; News report, Chicago Tribune, Jan. 1, 1985, sec. 1, at 5 ("Federal agents said Monday that a construction worker *** admitted bombing four abortion clinics and hinted that a 'secret' organization was committing terrorist acts."); *Three more abortion facilities bombed*, Chicago Tribune, Dec. 26, 1984, sec. 1, at 14 ("The Ladies Center was the first hit, and the second explosion caused a fire that gutted the office of [one of the doctors] which had been picketed during the summer by abortion opponents. The final blast hit [another doctor's] office."); Goodman, *Terrorism is no solution to the abortion issue*, Chicago Tribune, Nov. 30, 1984, sec. 5, at 1; Barron, *Campaign against abortion adopts more violence*, Chicago Tribune, Nov. 9, 1984, Tempo, at 1; Van, *Birth clinic violence condemned*, Chicago Tribune, Oct. 18, 1984, sec. 1, at 6; Editorial, *A dire warning*, Chicago Sun-Times, Jan. 12, 1985, at 13 ("[T]he outbreak of attacks on abortion clinics is being considered ever more seriously by federal law enforcement agencies, one of which has issued a warning frightening in its implications. *** One could certainly contend that the like-minded objectives of those who are perpetrating the crimes amount to a de facto conspiracy. And certainly what is occurring can be called no less than terrorism. Terrorism does not require a political motivation. There is no discernible difference between the activi-

ties of the professional terrorists who serve ideology and the amateur terrorist who defies the law for personal belief. The attacks must be stopped."); Editorial, *Damaging their causes*, Chicago Sun-Times, Nov. 20, 1984, at 31 ("Of greater seriousness, however, is the dangerous zealotry of individuals in the United States who profess a reverence for life, yet seek to defend that belief with firebombs. As we have noted, it is tragically incongruous for anti-abortionists to threaten the lives of others. *** The Sun-Times condemns abortion, but it must also condemn those who commit criminal and life-threatening acts under the delusion they are promoting the anti-abortion cause."); Editorial, *To abortion opponents*, Chicago Sun-Times, Oct. 19, 1984, at 43 ("The Sun-Times has minced no words on the question of abortion. We abhor the practice, and we condemn the attitude that it is a private matter of 'personal choice' only, devoid of any moral or ethical considerations. It is with great regret, therefore, that we must take note of—and strongly condemn—the violent actions of some zealots who are on our side in this great debate. We do not know whether the firebombing of abortion clinics in many parts of the country has resulted from a centrally directed conspiracy; but we do know that the incidents occurred. *** Opposition to abortion seeks to derive its inherent strength from a cherished belief in the sanctity of life. So it is tragically incongruous for some anti-abortionists to threaten somebody's life, either directly *** or indirectly, as in the case of setting fires to abortion clinics."); Time, *Explosions over Abortion*, Jan. 14, 1985, at 16; Newsweek, Special Report, *America's Abortion Dilemma. Twelve years after a landmark court decision, the agonizing moral issue still divides the nation and defies compromise. Now the debate has turned violent*, Jan. 14, 1985, at 20; Time, *New Heat over An Old Issue*, Feb. 14, 1985, at 17; Newsweek, *An Abortion Anniversary*, Feb. 4, 1985, at 22.

JUSTICE McNAMARA, dissenting:

I respectfully dissent. I do not believe that the disclosure of the names of abortion providers and the amount of public funds they receive infringes on welfare recipients' freedom to make a decision to have an abortion.

The majority concludes that the welfare recipients' privacy rights are affected after a series of premises, the most important of which is based on assumption and speculation. The majority begins with the accepted premises that a woman's decision to abort her pregnancy involves her fundamental right to privacy (*Roe v. Wade*

(1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705), that she must be able to effectuate her decision and consult with her doctor without interference (*Whalen v. Roe* (1977), 429 U.S. 589, 51 L. Ed. 2d 64, 97 S. Ct. 869), and that her doctor must be freely able to practice medicine in order to advise her about the abortion decision. The majority then infers a fourth premise that disclosing to the public the names of doctors who provide welfare abortions will result in harassment of these doctors. Consequently, they cannot advise their patients and the patients' rights are infringed. In support of this fourth premise, the majority appends a series of media reports about the recent violent attacks on abortion clinics. Although I agree that "the terrorism of abortion clinics by anti-abortion vigilante groups [is] very real," I cannot assume, without support in the record, that plaintiffs are such a group or that by releasing public expenditure information to plaintiffs such "terrorist acts" will result or that plaintiffs would "arbitrarily restrain" the practices of doctors performing the welfare recipients' abortions.

The State Records Act provides that records of the use of public funds are public records available for inspection. The Act does not require that persons requesting information must provide their reasons for doing so. Certainly, by providing such access, the legislature intended that persons would act upon the information. Plaintiffs have not indicated, nor must they indicate, what purpose they have in seeking the names of abortion providers. It seems more probable that, rather than arbitrarily restraining the doctors' practices, the court could as easily surmise that plaintiffs intend to exercise their fundamental rights to speak out freely against abortion.

In support of the department's and the medical society's positions, the Roger Baldwin Foundation of the ACLU asserts the position that access to public expenditure records should be restricted. In addition to the argument accepted by the majority, the ACLU maintains that by providing plaintiffs with the information they requested, the State would be assisting in the invasion of welfare recipients' rights of privacy in violation of the Records Act. The ACLU brief also takes the illogical leap that an informed public will commit unlawful acts to hinder a woman's personal choice regarding an abortion.

The Supreme Courts of Minnesota and Kansas were both presented with the identical argument that disclosure of doctors' names would interfere with their patients' decision to seek an abortion. (*Minnesota Medical Association v. State* (Minn. 1978), 274 N.W.2d 84; *State ex rel. Stephan v. Harder* (1982), 230 Kan. 573, 641 P.2d

366.) Both courts rejected such speculation. The Minnesota court stated:

> "The disclosure sought to be prevented in this case would not constitute such an 'otherwise unconstitutional restriction.' Disclosure places no burden on the doctor, does not destroy the confidentiality of his relationship with patients, and does not restrict his freedom to exercise his medical judgment." (274 N.W.2d 84, 92.)

The courts also noted that disclosure might in fact aid women who were seeking doctors willing to perform an abortion.

Furthermore, a woman's right to privacy to decide whether to have an abortion without interference is not absolute. The United States Supreme Court has upheld the States' rights to refuse to provide Medicaid funds for nontherapeutic abortions. (*Maher v. Roe* (1977), 432 U.S. 464, 53 L. Ed. 2d 484, 97 S. Ct. 2376; *Beal v. Doe* (1977), 432 U.S. 438, 53 L. Ed. 2d 464, 97 S. Ct. 2366.) Although welfare recipients may freely decide whether to have an abortion, the Illinois Department of Public Aid only pays for abortions "necessary for the preservation of the life of the woman seeking such treatment." (Ill. Rev. Stat. 1983, ch. 23, par. 5—5.) Obviously the refusal to pay seriously interferes with a poor woman's decision to abort, but such interference is valid. Assuming that there is any interference with the personal decision of a woman because the State has released the names of doctors who provide abortions, I would find that the countervailing rights of the parties seeking such information should prevail. Despite the majority's attempt to qualify its holding, I believe that it sets a dangerous precedent to shroud information about public expenditures in a cloak of secrecy or to require that persons requesting such information provide an acceptable reason for their request.

Since I agree with that portion of the majority opinion which finds defendants' remaining arguments to be without merit, and because I believe disclosure of the information requested by plaintiffs does not interfere with welfare recipients' fundamental rights, I would remand the cause to the trial court with instructions to issue the *mandamus*.