**MONMOUTH COUNTY CORRECTIONAL INSTITUTION INMATES, et al., Plaintiffs,**

v.

**William LANZARO, Sheriff, et al., Defendants.**

Civ. No. 82–1924.

United States District Court, D. New Jersey.

May 29, 1986.

Order June 30, 1986.

Catherine A. Hanssens, Audrey Bomse, New Jersey Dept. of the Public Advocate, Office of Inmate Advocacy, Trenton, N.J., for plaintiffs.

James Zazzali, Zazzali, Zazzali & Kroll, Newark, N.J., Special Master.

Malcolm V. Carton, Monmouth County Counsel, Avon, N.J., for defendants.

## OPINION

HAROLD A. ACKERMAN, District Judge.

### I. *Introduction*

This is a class action instituted by the inmates of Monmouth County Correctional Institution (MCCI) against MCCI officials and various county and state defendants including William Lanzaro, the Monmouth County Sheriff, and William H. Fauver, Commissioner of the New Jersey Department of Corrections.[1] Plaintiffs seek preliminary injunctive relief from the policies and practices of county defendants at MCCI, which allegedly deny pregnant inmates essential health care with respect to counseling, access to, and funding for abortions. Plaintiffs challenge the validity of these policies and practices under both the

---

1. The remaining defendants are: Nelson Stiles, Warden (MCCI); Dr. Jacob Lewis, Physician (MCCI); Harry Larrison, Jr.; Clement Som- mers; Frank Self, Thomas Powers and Ray Kramer and their successors in office.

New Jersey and United States Constitutions.

## II. *Background*

In June 1983, plaintiffs filed an Amended and Supplemental Class Action Complaint following the consolidation by this court of various pro se civil actions by the inmates at MCCI. Plaintiffs challenged the overcrowding and various other conditions at the institution. Thereafter, this court issued an order granting constitutionally-mandated relief from the overcrowding and directed that other corrective measures be implemented.

In January 1985, plaintiffs applied for an Order to Show Cause, seeking preliminary injunctive relief from systemic deficiencies in meeting the general health care needs of pregnant inmates. The parties subsequently entered into a consent judgment which provided for whatever immediate relief was "necessary to protect the health of the female inmates." Unable to obtain any services through MCCI which were related to the termination of inmate pregnancies, plaintiffs, in April of this year, applied again for an Order to Show Cause with temporary restraints and requested that county defendants be required to provide all necessary medical care, including counseling, access to, and funding for abortions to Jane Doe, a pregnant inmate and member of the class, and all other class members. Following the release of Jane Doe, the class representative,[2] this court denied plaintiffs' application for temporary restraints and set a date for the preliminary injunctive hearing.

## III. *Findings of Fact*

The facts are undisputed. At the time plaintiffs filed the instant petition, Jane Doe was approximately nine weeks pregnant. *See* Affidavit of Jane Doe, Apr. 15, 1986. Prior to the hearing on plaintiff's application it was learned that another inmate, Mary Smith, was seeking counselling and an abortion. *See* Affidavit of Mary Smith, May 19, 1986. Both inmates had been denied access to and funding for an abortion by the MCCI officials pursuant to the institution's policy of providing an abortion only in a medical emergency which constitutes a life-threatening situation for the mother. The institution's policy also requires that pregnant inmates in non-life-threatening situations apply to the court for an order releasing them on their own recognizance in order to arrange personally for their abortions. For those inmates incarcerated on extremely serious charges and for whom no release is possible, there is no alternative but to carry to term. By contrast, all pregnant inmates who elect to carry to term are provided with complete prenatal care, including testing, treatment and delivery at an outside clinic.

Plaintiffs challenge MCCI's policy of requiring pregnant inmates who desire an abortion to apply for a court-ordered release as an unconstitutional infringement upon their right to privacy, as set forth in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and its progeny. They contend that defendants' refusal to provide pregnant inmates with *all* necessary medical care related to their pregnancies constitutes deliberate indifference to plaintiffs' medical needs and, thus, deprives them of equal protection of the laws in violation of both the Eighth and Fourteenth Amendments to the federal Constitution, respectively. Plaintiffs also allege that defendants' discriminatory policies unconstitution-

---

**2.** Jane Doe is a pseudonym. Ms. Doe was released in order to secure an abortion. The claims of the remaining unnamed members of the class, however, remain alive as does Ms. Doe's standing to represent the class. The fact of certification will preserve class standing even after a named representative has lost the required personal stake when the problems posed are "capable of repetition, yet evading review." *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). In *Roe,* the United States Supreme Court stated that "[p]regnancy provides a classic justification for a conclusion of nonmootness" since it obviously could be "capable of repetition, yet evading review." 410 U.S. at 125, 93 S.Ct. at 712.

ally infringe upon their rights and privileges under the New Jersey Constitution.

In support of its policies, the county asserts its statutory obligation under N.J.Admin.Code tit. 10A § 31–3.15(a) (1979), which merely requires the county to provide "essential" medical care to the inmates.[3] The county contends that the provision of abortions, and other "purely elective medical procedures", would pose an insurmountable administrative and financial burden on the county. They also attempt to justify and attribute the limitations placed upon the inmates' rights and privileges to the very fact of their lawful incarceration, which allegedly necessitates such limitations.

## IV. *Legal Findings*

### A. *Jurisdiction and the Applicable Law*

■ Plaintiffs allege violations of their rights and privileges under both the New Jersey and United States Constitutions. Their claims, therefore, are of both a state and federal nature. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (1982), which gives district courts jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. Since the federal and state constitutional claims derive from a common nucleus of operative fact, and since the court has jurisdiction over the parties, and the federal claims asserted by plaintiffs are substantial, the pendent state law claims are properly before the court. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

■ State law is applied by federal courts in three situations: (1) when they are so required by *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), (2) when they are so directed by a federal statute, or (3) as a matter of discretion in their exercise of power to so choose. 19

*Wright, Miller & Cooper, Jurisdiction* § 4515 (1976). The *Erie* doctrine applies in federal question as well as diversity cases. As the Second Circuit explained in *Maternally Yours v. Your Maternity Shop*, 234 F.2d 538, 540 n. 1 (2d Cir.1956):

> [I]t is the *source* of the right sued upon, and not the ground on which federal jurisdiction over the case is founded, which determines the governing law. ... Thus, the *Erie* doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law. ... Likewise, the *Erie* doctrine is inapplicable to claims or issues created and governed by federal law, even if the jurisdiction of the federal court rests on diversity of citizenship.

Thus, this court will apply state and federal law, respectively, to the state and federal claims herein. As stated in the Rules of Decision Act, 28 U.S.C.A. § 1652 (1982): "The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States...."

■ Unfortunately, my research discloses no New Jersey or federal caselaw which addresses the right of pregnant inmates in a county jail to public funds for abortions. In deciding the state law claims, this court must make an informed prediction as to the probable ruling by the New Jersey Supreme Court if it were confronted with the same case. *W.A. Wright v. KDI Sylvan Pools*, 746 F.2d 215 (3d Cir.1984) (citing *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir.1981)); *see also Becker v. Interstate Properties*, 569 F.2d 1203, 1205 (3d Cir.1977) and cases cited therein. In so doing, this court will take account of the doctrinal trends of the law of New Jersey as well as the underlying policies of

---

**3.** N.J.Admin.Code tit. 10A § 31–3.15(a)(1979) provides as follows:

During the period of confinement, the inmate is a ward of the county and concern shall be shown for both his physical and mental well-being. While it would be unrealistic to burden the county jail with responsibility for all the inmates' health needs, essential medical, dental, and health service care shall be provided.

the State and rule accordingly, as mandated by the Third Circuit in *Becker*. *Id.* at 1206.

### B. *Preliminary Injunction*

It is well settled that in analyzing a plaintiff's application for preliminary injunctive relief, a court must consider four factors. In *Pilgrim Medical Group v. N.J. State Board of Medical Examiners*, 613 F.Supp. 837, 845 (D.N.J.1985), the district court of New Jersey enumerated them as follows:

"(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of such relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party and (4) whether granting preliminary relief will be in the public interest."

*See also SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir.1985), (citing *Klitzman, Klitzman and Gallagher v. Krut*, 744 F.2d 955, 958–59 (3d Cir.1984)); *Continental Group v. Amoco Chemicals Corp.*, 614 F.2d 351, 356–57 (3d Cir.1980). Considering the parties' respective positions in light of the above-mentioned guidelines, and for the reasons set forth below, this court finds that plaintiffs are entitled to the injunctive relief sought.

### 1. *Likelihood of success on the merits*

■ As stated above, plaintiffs must demonstrate the likelihood, not the certainty, of success on the merits in order to prevail. *See Bergen Drug Co. v. Parke, Davis and Co.*, 307 F.2d 725, 727 (3d Cir. 1962); *see also Fitzgerald v. Mountain Laurel Racing, Inc.*, 464 F.Supp. 263, 269 (W.D.Pa.1979). With respect to the challenged court-ordered release requirement imposed upon pregnant inmates by MCCI, plaintiffs have clearly established the probability of ultimately prevailing on the merits. In *Roe v. Wade*, the United States Supreme Court set forth guidelines delineating the extent to which government may interfere with a woman's right to terminate her pregnancy. During the first trimester,

the state has no role in the abortion decision, which is completely in the hands of the woman and her attending physician. 410 U.S. at 164, 93 S.Ct. at 732. During the second trimester, the state may "regulate the abortion procedure in ways that are reasonably related to maternal health." *Id.* In the third trimester, the state may "regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 164–65, 93 S.Ct. at 732–33. Pertinent here is the Court's reference to the well-established rule that where certain fundamental rights are involved, regulations limiting these rights may be justified only by a "compelling state interest." *Id.* at 155, 93 S.Ct. at 727. In *City of Akron v. Akron Center for Reproductive Health*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), the Court, applying the same test of constitutionality to invalidate a second trimester hospitalization and twenty-four hour waiting period requirement, held that any statute, other than a governmental spending statute, which adds cost and delay to the abortion procedure will not be upheld if it imposes any significant impact on the right to abortion, unless justified by a compelling state interest.

■ Plaintiffs argue that the court order requirement will significantly delay an inmate's ability to exercise her right to terminate her pregnancy. They point to the substantial amount of time required to contact the public defender or private attorney and the inevitable additional delays involved thereafter. They contend that those women who are unable to secure a court-ordered release because of the gravity of the offense of which they are convicted are effectively totally deprived of their right to choose an abortion.

Defendants offer no justification for this infringement on the inmates' fundamental right, let alone a compelling state interest. Following *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1973), the Third Circuit in *O'Malley v. Brierley*,

477 F.2d 785 (3d Cir.1973), mandated that the means employed to achieve the state goal must be "the least possible regulation of the constitutional right consistent with the maintenance of prison discipline." 477 F.2d at 796. Even presuming, the compelling state interest supporting the county policy is internal security and the public safety, the county's requirement is not the least restrictive means consistent with the maintenance of prison discipline. The county policy does not require inmates who choose to carry to term or those who need outside medical care to obtain a court-ordered release. All other things being equal, inmates who wish to have an abortion pose no greater security risk than any other inmate who requires outside medical attention. As the Third Circuit recently held in *Shabazz v. O'Lone,* 782 F.2d 416, 420 (3d Cir.1986), "the state must show that the challenged regulations were intended to serve, and do serve, the important penological goal of security, and that no reasonable method exists by which appellants' ... [constitutional] rights can be accommodated without creating bona fide security problems." [4]

Applying these constitutional precepts, I find that the county regulation requiring pregnant inmates to obtain a court-ordered release unquestionably has a "significant impact" upon and impermissibly burdens a woman's right to choose abortion. It is, therefore, unconstitutional under the United States Constitution.

■ In so holding, it should be noted that the same result would obtain if the state law of New Jersey were to be applied. In *Farhi v. Deal Borough Commissioners,* 204 N.J.Super. 575, 499 A.2d 559 (Law Div. 1985), a municipal zoning ordinance was held to unconstitutionally violate the state constitutional protection of freedom of worship. As in the instant case, the ordinance failed to use the least restrictive means to enable the citizens to exercise their consti-

tutional right, and the borough failed to establish any governmental interest which could be deemed overriding. *See also Comras v. Lewin,* 183 N.J.Super. 42, 45, 443 A.2d 229 (App.Div.1982) (holding that the increased risks associated with abortions delayed to the second trimester are of such magnitude that, while the abortion option remains technically and lawfully available, the mother is effectively denied a meaningful opportunity to choose).

■ Turning to the constitutionality of the county's refusal to *appropriate funds* for non-life-threatening inmate abortions, this court finds that such a policy, while valid under the federal Constitution, does violate the Constitution of New Jersey. Plaintiffs contend that the county's policy of refusing to fund both medically necessary and elective abortions, while assuming full financial responsibility for those abortions which pose a serious threat to the mother's life, violates their rights and privileges under both the Eighth and Fourteenth Amendments as well as under the New Jersey Constitution. Leaving aside plaintiffs' Eighth Amendment claim for the moment, this court must consider separately plaintiffs' federal and state claims.

Defendants rely on two United States Supreme Court cases in support of their position that they are not required under the federal Constitution to fund nontherapeutic abortions. In *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), and *Beal v. Doe,* 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), a companion case, the Supreme Court made it clear that there is no constitutional right to funding for nontherapeutic abortions. In *Maher,* the Court specifically sustained Connecticut's use of Medicaid funds to reimburse women for the costs of childbirth and "medically necessary" first trimester abortions (including psychological necessity), and its denial of funds, for the costs of

---

4. Such a showing would indeed be difficult, if not impossible, in view of the absence of a similar requirement in the Correctional Institution for Women at Clinton and in the federal prisons. *See* Stipulation of Facts dated May 20,

1986 and 28 C.F.R. § 551.23(d) (1985), which provides: "At the inmate's request, medical staff shall arrange for the abortion to take place at a hospital or clinic outside the institution."

elective or non-therapeutic first trimester abortions. The *Maher* Court, in analyzing the equal protection claim, found neither a suspect classification nor an infringement of a fundamental right. In so concluding, the Court construed *Roe* to mean that a woman does not have a fundamental right to an abortion, but merely a right to choose whether or not to terminate her pregnancy. Applying the more liberal rational relationship test of constitutionality, the Court found that encouraging normal childbirth was a legitimate state objective to which the statute was "rationally related." 432 U.S. at 478–80, 97 S.Ct. at 2384–85. In *Beal*, the Court held that Title XIX of the Social Security Act, which established a Medicaid program, does not require state funding of nontherapeutic first trimester abortions as a condition precedent to participation in the joint federal-state program. These two cases clearly support defendants' position that the county is not constitutionally required to fund nontherapeutic or "elective" abortions.

In 1980, the Court went a step further in *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), when it sustained a more restrictive version of the Hyde Amendment, which placed various restrictions on the use of federal Medicaid funds for abortions. The version of this statute in effect at the time of *Harris*, prohibited use of Medicaid funds for abortions except where the mother's life was endangered and in instances of rape or incest. *See* Pub.L. No. 96–123, § 109, 93 Stat. 926 (1979). Again the Court found that the existence of a constitutionally protected right did not obligate the government to grant the funds necessary to exercise the right. Using the same "minimum rationality" test of constitutionality, the Court found, as in *Maher*, no violation of the equal protection clause of the Fourteenth Amendment. Another case, decided the same day as *Harris*, *Williams v. Zbar-*

*az*, 448 U.S. 358, 100 S.Ct. 2694, 65 L.Ed.2d 831 (1980), upheld an Illinois statute which prohibited Medicaid funds for all abortions except those necessary to preserve the life of the mother. These two later cases establish that the prohibition of funds for abortions which are medically necessary, as well as those which are purely elective, is constitutionally valid. Therefore, the county's current policy is not violative of the federal Constitution.

Notwithstanding the impact of this federal caselaw upon plaintiffs' federal claims, its' claims must also be evaluated under state law. Plaintiffs have alleged the county's denial of funds for medically necessary abortions violates their right to equal protection of the law under the New Jersey Constitution, art. 1, para. 1. As noted above, this court has a duty, in the absence of any New Jersey Supreme Court cases which are squarely on point, to make an informed judgment as to how that court would rule on the case at bar.

In *Right to Choose v. Byrne*, 91 N.J. 287, 450 A.2d 925 (1982), the New Jersey Supreme Court held that a statute which restricts the funding of abortions to those necessary to save the life of the mother violates the state constitution. The court found that while there is no fundamental right to funding for abortions, there is a fundamental right to choose whether to have an abortion, which extends to *all* women, including those entitled to Medicaid reimbursement for "necessary medical treatment." *Id.* at 305, 450 A.2d 925. Using a balancing test of constitutionality,[5] the court invalidated N.J.S.A. 30:4D–6.1 (West 1981), which restricted Medicaid funding to abortions necessary to save the life of the mother. *Id.* at 309–10, 450 A.2d 925. The Court determined that a woman's right to choose to protect her health by terminating pregnancy outweighed the state's asserted interest in protecting po-

---

**5.** In New Jersey, the balancing test approach to equal protection analysis involves a consideration of the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the

restrictions. *Greenberg v. Kimmelman,* 99 N.J. 552, 567, 494 A.2d 294 (1985) (citing *Right to Choose v. Byrne,* 91 N.J. at 300–01, 450 A.2d 925 and *State v. Hunt,* 91 N.J. 338, 364, 450 A.2d 952 (1982)).

tential life at the expense of the woman's health. *Id.* at 310, 450 A.2d 925. The statute was found to impinge upon the fundamental right of a woman to choose whether to terminate her pregnancy or bear her child and to unconstitutionally discriminate between women for whom medical care is necessary for childbirth and those for whom an abortion is deemed medically necessary. *Id.* at 305–06, 450 A.2d 925. By denying equal protection to women entitled to medically necessary services under Medicaid, the statute violated art. 1, par. 1 of the state constitution,[6] which mandates a more expansive grant of rights than does the federal Constitution.[7] The court acknowledged that the challenged statute would not be invalid under the federal Constitution. *Id.* at 302–03, 450 A.2d 925. With respect to elective, nontherapeutic abortions, the court held that the New Jersey Constitution does not require funding of those abortions which do not affect the life or health of the mother.[8] *Id.* at 310, 450 A.2d 925. Noting its duty to save a statute if reasonably susceptible to constitutional interpretation by engaging in "judicial surgery," the court deleted the constitutional defect and construed the statute to limit funding to abortions "medically necessary" to preserve the *life or health* of a woman. *Id.* at 311–12, 450 A.2d 925.

▪ Applying the holding and rationale of *Right to Choose* here, this court concludes that under the state constitution and New Jersey law, the county must provide funding for all requested inmate abortions which are "medically necessary," *i.e.*, all those necessary to protect the *life or health* of the mother.

*Right to Choose* provides guidance in defining a "medically necessary" abortion. The Court stated: "The determination of 'medical necessity' is the proper province of physicians, who may be guided, to the extent consistent with competent medical treatment, by the regulations of the Department of Human Services." The regulations referred to, N.J.Admin.Code tit. 10 § 53–1.14(a)(b) (1984), provide as follows:

(a) Effective May 1, 1980, Medicaid will pay for all medically necessary abortions.

(b) A physician may take the following factors into consideration in determining whether an abortion is medically necessary:

1. Physical, emotional, and psychological factors;

2. Family reasons;

3. Age.

In determining which abortions are to be classified as "medically necessary," the county will hereinafter be guided by the above-cited provision and assume the necessary financial responsibility accordingly.

▪ Ordinarily, having reached the above result, it would be unnecessary to address whether defendants' policies and practices constitute an eighth amendment violation of the inmates' rights. The case law reviewed thus far does not mandate that the county provide elective, nontherapeutic abortions to pregnant inmates. Plaintiffs contend, however, that a deliberate denial of the inmates' serious medical

---

**6.** Art. 1, par. 1 of the New Jersey Constitution provides as follows: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."

**7.** Even prior to *Right to Choose*, the New Jersey Supreme Court acknowledged the supplemental and more expansive rights afforded individuals under the state as opposed to the federal Constitution. *See State v. Schmid,* 84 N.J. 535, 553, 423 A.2d 615 (1980) ("[S]tate constitutions exist as a cognate source of individual freedoms and

... state constitutional guarantees of these rights may indeed surpass the guarantees of the federal Constitution.").

**8.** This court finds that defendants' characterization of all abortions, other than those which seriously threaten the life of the mother, as "purely elective" to be a grossly inaccurate generalization. The cases cited *supra* clearly and expressly distinguish between "elective, nontherapeutic" abortions, and those which are medically necessary to preserve the mother's health. Therefore, not all nonlife-threatening abortions are elective and thereby excluded from public funding.

needs, including elective abortions, is a breach of the county's affirmative obligation to attend to the needs of the wards in their custody, and constitutes an eighth amendment violation.

In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the United States Supreme Court enunciated the standard for determining whether the administration of medical care in a prison violated constitutional requirements under the eighth amendment. That Court held that "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106, 97 S.Ct. at 292. The Third Circuit has interpreted and applied this standard in *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1081 (3d Cir.1976), in which it was determined that "[A] 'serious' medical need may fairly be regarded as one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *See also Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754 (3d Cir.1979) (while negligence in delivery of medical treatment to inmates is not constitutionally actionable, provision of inadequate treatment *is* when it is a result of deliberate indifference to inmates' serious medical needs).

In 1975, however, the court in *Derrickson v. Keve*, 390 F.Supp. 905 (D.Del.1975), concluded that in view of the fact that a prisoner, who suffered from severe and frequent headaches and congestion, was serving a life sentence, a determination never to permit the prisoner to obtain recommended surgery would be "arbitrary, capricious, and cruel." The court reasoned that in that particular case, the failure to provide the prisoner with the elective surgery was significant because the prisoner was serving a life sentence. Depriving plaintiff of such surgery would, in effect, make his condition irreparable because of the length of his sentence and the unlikelihood of imminent release.

Those inmates who desire an elective abortion, but who cannot be released because of security reasons, may in some instances, be in an analogous situation to that of the inmate in *Derrickson.* Although they may not be serving life sentences, their conditions are also rendered "irreparable" if they are not permitted to obtain an abortion while incarcerated pursuant to a sentence which exceeds the period of time in which an abortion may safely be performed.

More recently in *West v. Keve*, 541 F.Supp. 534, 540, (D.Del.1982), *rev'd on other grounds*, 571 F.2d 158 (3d Cir.1978), the district court of Delaware, citing *Derrickson*, agreed that the obligation of a correctional institution extends to "providing reasonably prompt access to elective surgery." In that case, a prisoner in the Delaware Correctional Center alleged an eighth amendment violation on the part of prison officials for their failure to schedule recommended surgery for a severe case of vericose veins with reasonable promptness. The court found that the significant delay between the recommendation of the physician that the prisoner have surgery and the completion of the surgery was a denial of the prisoner's right to reasonably prompt access to elective surgery.

While the facts of *Derrickson* and *West* differ from those of the case at bar, those cases nevertheless support a prisoner's right to recommended elective medical treatment. *See also Laaman v. Helgemoe*, 437 F.Supp. 269, 311 (D.N.H.1977) ("Even elective treatment recommended by a physician but not 'necessary' in life or health saving sense, may be constitutionally mandated upon a prisoner's election."). This court accordingly concludes that, with respect to those inmates whose release to obtain a recommended elective abortion is precluded by reasons of security, the refusal of the county to provide abortion services constitutes a violation of their eighth amendment rights. As to this group of women, the county is constitutionally obligated to provide such services at the expense of the government.

This leaves only one remaining group of pregnant inmates, *i.e.*, those who desire elective abortions and who would, under the county's current policy and practice, be freed on their own recognizance to secure them. It must be noted and emphasized that the relief sought herein is equitable in nature. Equitable considerations must therefore be taken into account by this court in the disposition of this case. Plaintiffs argue that inmates are totally dependent upon the institution to meet their medical needs. This imposed dependency derives not only from their physical confinement, but from the unavailability of other outside resources, such as gainful employment and Medicaid coverage, while they are incarcerated. Their ability to pay for abortions, even given the fact of possible release, is diminished accordingly.

This financial obstacle, imposed upon them by their status as inmates, substantially restricts their ability to exercise their right to choose to terminate their pregnancies. As stated by the United States Supreme Court, a prisoner must be permitted to retain those rights which are not inconsistent with their status as prisoners or with the legitimate penological objectives of the prison. *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Permitting pregnant inmates to exercise their right to choose and then to carry through with that decision, is in no way inconsistent with their status as prisoners or with the goals of the correctional system. Additionally, the prisons should be and are constitutionally required to provide for all the serious medical needs of the inmates, whose imposed financial dependency is, as noted above, a result of their incarceration.

Lastly, it is extremely significant to note that women in state and federal prisons are currently able to secure abortions at state and federal expense, respectively.[9] It would produce highly inconsistent and inequitable results if funding for inmate abortions were to turn solely upon the policy of the particular institution in which these women are incarcerated. After due consideration of the above factors, this court concludes that the county is financially obligated to assume the full cost of its inmates' elective, as well as medically necessary abortions. These abortions are simply one type of elective medical treatment to which inmates are legally and equitably entitled.

Regarding the county's duty to provide counseling services to pregnant inmates to assist them in their decisions concerning abortions, the county should be required, at the very least, to provide assistance to the same extent as is required of the federal prisons. This obligation of federal prisons is governed by 28 C.F.R. § 551.23(b) which provides that "[t]he Warden shall provide medical, religious and social counseling to aid the inmate in making the decision to have an abortion or bear the child." Few if any decisions, which a woman must make in her lifetime, are of comparable consequence or difficulty. Having to deal both with an untimely pregnancy and the fact of incarceration makes a decision, difficult under normal circumstances, doubly so. These women would unquestionably benefit from and, I believe, greatly appreciate such assistance in their decision making process, as would society in the long run.

### 2. *Irreparable Harm*

Having concluded that plaintiffs have clearly established their probability of success on the merits, I turn to the second element which plaintiffs must establish in order to prevail on their application for preliminary injunctive relief. As noted *supra,* plaintiffs must demonstrate irreparable harm in the event the relief requested is denied.

The Third Circuit has interpreted "irreparable harm" to mean "that which cannot be repaired, retrieved, put down again [or]

---

**9.** *See supra* note 4. The federal regulation makes no distinction between "elective" and "medically necessary" abortions in its provision for inmate abortions.

atoned for." *In Re: Arthur Treacher's Franchise Litigation*, 689 F.2d 1137, (3d Cir.1982) (citing *Gause v. Perkins*, 3 Jones Eq. 177, 56 N.C. 177, 69 Am Dec. 728 (1857)).

It is well-accepted that a substantial delay in the decision to abort increases the risks associated with the procedure. The Appellate Division of the New Jersey Superior Court, noting the effect of such increased dangers on the mother's ability to make the initial decision, stated:

The enhanced risks of an abortion delayed to the second trimester are of such nature and magnitude that, even though abortion remains lawfully available, the parent is effectively 'denied a meaningful opportunity' to decide whether the fetus should be aborted.

*Comras v. Lewin*, 183 N.J.Super. 42, 45, 443 A.2d 229 (App.Div.1982). The county's requirement of a court-ordered release, as discussed above, unquestionably imposes substantial delays on the procedure and may, in some instances, thus cause substantial injury to plaintiffs. Its current policy of only funding those abortions which constitute a serious threat to the mother's life has effectively eliminated the option entirely for many inmates, and would continue to do so in the future if this court does not grant plaintiffs' requested relief. Money damages are obviously not an adequate remedy in such situations. I find, therefore, that plaintiffs have adequately established the requisite irreparable injury.

#### 3. *Balancing the Relative Hardships*

I now turn to the third element, *i.e.,* whether granting preliminary relief will result in even greater harm to the nonmoving party. As concluded immediately above, plaintiffs have amply demonstrated the irreparable harm they will suffer if relief is not granted. By contrast, defendants contend that to provide such elective surgery to the inmates would impose an insurmountable, administrative and financial burden on the county. I am unpersuaded by defendants' argument. They neither elaborate upon nor support this contention. Plaintiffs point out, and this

court agrees, that it is considerably less expensive to provide a first trimester abortion than it is to provide all the necessary medical care to inmates who choose to carry to term. It is also reasonable to assume that one surgical procedure would be less burdensome to arrange than all of the pre- and post-medical services associated with a full term pregnancy and delivery. Accordingly, I conclude that plaintiffs have clearly established that the hardships they would suffer if relief were denied weigh overwhelmingly in the balance.

#### 4. *Public Interest*

Plaintiffs' final burden is to demonstrate that a decision granting the desired injunctive relief is consistent with the public interest. It is patently clear that the issuance of an injunction which enjoins policies and practices which impinge upon another's constitutional rights and privileges is the duty of our courts in light of our nation's fundamental political principles. *See St. Claire v. Cuyler*, 482 F.Supp. 257, 259 (E.D.Pa.1979). It would certainly be inconsistent with the public policy of both the United States and New Jersey to continue to deny financial and moral assistance to those in need of essential medical services, especially when those individuals are entirely dependent upon the government for that assistance.

### V. *Conclusion*

The attempt to achieve uniformity in our case and statutory law has been a long-standing and desirable goal of our jurisprudential and legislative systems. It should be an equally desirable objective within our correctional institutions. No governmental entity may arbitrarily impose its individual policies upon society when they conflict with and infringe upon the constitutional rights of the people. Encroachments upon the right to choose pregnancy termination must be stricken if they are not supported by a compelling and overriding interest. The county's current policies, as described herein, exemplify such impermissible intrusions and, accordingly, require the exercise of this court's

injunctive powers. Plaintiffs' application for a preliminary injunction is granted.

### ORDER

This matter having been opened by this Court on plaintiffs' application for preliminary injunctive relief by an Order to Show Cause, and after hearing arguments on May 29, 1986 and reviewing the evidence and arguments submitted by counsel, and for good cause shown,

This Court finds that plaintiffs have demonstrated a probability of ultimately prevailing on the merits of their claim challenging the policies and practices of the Monmouth County defendants Lanzaro, et al., denying plaintiffs medical and counseling services related to pregnancy termination; and that plaintiffs have demonstrated that, in the event the requested relief is denied, they will suffer irreparable harm which overwhelmingly outweighs any possibility of harm to the County defendants; and that the grant of relief which plaintiffs seek is entirely consistent with the public interest; and for those reasons set forth in detail in this court's opinion issued on May 29, 1986,

It is on this 30th day of June 1986:

ORDERED that plaintiffs' application for preliminary injunctive relief is granted specifically as follows:

ORDERED that County defendants immediately implement the following procedures to protect the constitutional rights of plaintiff class members who may seek to terminate their pregnancies:

1. County defendants shall cease the practice of requiring pregnant inmates who seek to terminate pregnancy to obtain a court-ordered release in order to arrange personally for an abortion.

2. County defendants shall, upon receipt of the laboratory results of the pregnancy test administered to women admitted to MCCI, communicate the results to the woman and inform her, if she is pregnant, of her right either to continue the pregnancy or to have an abortion, with costs for all related medical care to be at the county's expense.

3. County defendants shall provide professional counseling services, including medical and social counseling, to aid the pregnant inmate in making her decision to terminate the pregnancy or to carry the fetus to full term.

4. County defendants, through the MCCI medical department staff, shall complete all necessary arrangements at an appropriate medical facility for those inmates seeking an abortion, as soon as practicable following the inmate's decision to terminate the pregnancy.

5. County defendants shall assume the full cost of all inmate abortions.

6. County defendants, through their medical staff, shall provide all inmates who have a positive pregnancy test with a copy of this order as well as a copy of the March 8, 1985 consent judgment governing provision of prenatal care, in addition to verbally informing them of their rights related to their pregnancies.