No. 127,307

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STORMONT-VAIL HEALTHCARE, INC.,
*Appellant*,

v.

KANSAS DEPARTMENT OF HEALTH AND ENVIRONMENT,
DIVISION OF HEALTH CARE FINANCE,
*Appellee*.

SYLLABUS BY THE COURT

1.

When evaluating contradictory or inconsistent medical opinions regarding the medical necessity of a healthcare intervention in the Kansas Medicaid program, the reviewing agency must consider the relative length and comprehensiveness of the medical professionals' relationships with the patient. The reviewing agency may disfavor a treating physician's medical opinion when the treating physician has a relatively brief or tangential treatment relationship with the patient or the treating physician's medical opinion is conclusory or unsupported by medical evidence.

2.

The medical opinion of a treating physician with a long and comprehensive treatment relationship with the patient is important, but not irrefutable. In the Kansas Medicaid program, the reviewing agency must set forth a legitimate, reasoned basis supported by substantial evidence in the record when viewed as a whole and consistent with Medicaid's purpose for disfavoring a treating physician's medical opinion.

1

3.

Under K.A.R. 30-5-58(ooo)(1)(C), when evaluating the scope criteria of medical necessity, the reviewing agency under the Kansas Medicaid program must consider the record as a whole to determine whether "[t]he health intervention provides the most appropriate supply or level of service, considering potential benefits and harms to the patient."

4.

Under K.A.R. 30-5-58(ooo)(1)(E), when evaluating the value criteria of medical necessity for a health intervention, the reviewing agency under the Kansas Medicaid program must make an individualized determination of the benefits and harms relative to costs based on the patient's particular characteristics.

Appeal from Shawnee District Court; THOMAS G. LUEDKE, judge. Oral argument held August 5, 2025. Opinion filed May 8, 2026. Reversed and remanded with directions.

*Cameron S. Bernard*, *Amanda M. Wilwert*, and *Nancy E. Musick*, of Foulston Siefkin LLP, of Overland Park, for appellant.

*Darren K. Sharp* and *Megan J. Ochs,* of Armstrong Teasdale LLP, of Kansas City, Missouri, and *Matthew Langworthy*, of Kansas Department of Health and Environment, Division of Health Care Finance, for appellee.

Before HILL, P.J., MALONE and HURST, JJ.

HURST, J.: Under the Kansas Medicaid program, hospitals are only permitted reimbursement for inpatient healthcare services when, among other things, the record demonstrates those services were medically necessary. In this case, Stormont-Vail Healthcare, Inc. (Stormont-Vail) and the Kansas Department of Health and Environment, Division of Health Care Finance disagree about whether the record demonstrates that

2

Diana's (a pseudonym) inpatient healthcare services were medically necessary for the last two weeks of her pregnancy.

During Diana's inpatient hospitalization, Sunflower Health Plan became reticent that continued inpatient services were medically necessary and asked Stormont-Vail to determine whether a home health agency in Emporia would accept Diana as a patient. Stormont-Vail did not believe Diana was stable enough for discharge or that her condition was appropriate for home healthcare in Emporia. Sunflower Health Plan denied Stormont-Vail reimbursement for the last two weeks of inpatient care, and the State Appeals Committee (SAC) of the Kansas Department of Health and Environment, Division of Health Care Finance, upheld that decision. Stormont-Vail appeals.

While this court provides no opinion on whether the disputed inpatient healthcare services met the definition of medical necessity, the record shows that some of the SAC's factual findings were not supported by the record as a whole and that the SAC inaccurately applied the law when it failed to consider Diana's individual characteristics and assess the harms and benefits of the healthcare intervention. In making a medical necessity determination, the reviewing agency must make an individualized determination based on the record as a whole. Pursuant to K.S.A. 77-622(b) the district court's decision is reversed, and the SAC's Final Order is vacated. This matter is remanded to the district court with directions to remand it to the agency for reconsideration consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

This appeal stems from the Kansas Department of Health and Environment, Division of Health Care Finance's (KDHE) SAC Final Order upholding Sunflower Health Plan's (Sunflower Health) refusal to reimburse Stormont-Vail costs related to Diana's inpatient treatment. It is necessary to establish a bit of background before addressing the

facts here. The KDHE is a state agency charged with administration of Kansas' Medicaid program and Diana is a Kansas Medicaid beneficiary. The KDHE has oversight authority and manages the provision of healthcare services for all Kansas Medicaid beneficiaries. Sunflower Health is one of the insurance companies contracted with the KDHE to serve Medicaid beneficiaries in Kansas. Stormont-Vail, an acute care hospital in Topeka, is a "participating provider" authorized to provide healthcare services to Kansas Medicaid beneficiaries.

On August 10, 2018, Diana was admitted to an Emporia hospital with pregnancy complications, including hyperemesis gravidarum, commonly referred to as severe morning sickness, causing weight loss. Diana, who was 28 years old at the time and in the third trimester of pregnancy, suffered from complications from fetal alcohol syndrome, intellectual and learning disability, and anxiety disorders. Diana's hyperemesis gravidarum caused rapid weight loss during the pregnancy which necessitated Diana's transfer to Stormont-Vail on August 13 for more aggressive treatment. After about a week at Stormont-Vail, Diana was discharged only to be readmitted the next day, August 21, where she remained until October 23. Sunflower Health agreed to reimburse Stormont-Vail for Diana's inpatient stay until October 4 but refused to provide reimbursement for her inpatient treatment from October 5 through October 20.

*Diana's Inpatient Care*

Pamela Grant, M.D., a Stormont-Vail maternal fetal medicine physician, consulted on Diana's case on August 13, 2018. Dr. Grant's stated treatment goals were to reduce maternal symptoms, improve Diana's quality of life, and "prevent serious complications including electrolyte imbalances and vitamin deficiencies while minimizing the fetal effects of persistent maternal nausea and vomiting and the fetal risks of treatment options." At that time, Diana's treating physicians ordered continued intravenous hydration support. If that failed, they planned to consider more invasive methods to

4

ensure proper nutrition, such as a Dobhoff tube through the nose or a peripherally inserted central catheter (PICC) line to deliver total parenteral nutrition (TPN), which is an intravenous method of feeding that bypasses the gastrointestinal tract.

Diana wanted to leave the hospital, but the treating physicians were concerned that Diana could not care for a PICC line or Dobhoff tube at home. On August 17, 2018, Diana's case manager learned that the labor and delivery physicians at the Emporia hospital declined transfer of Diana because they could not manage her psychiatric or nutritional needs through tube feeding. After Diana tolerated eating some food without vomiting, Diana was discharged on August 20 to her home without any tube feeding interventions.

Diana returned to Stormont-Vail the next day with weight loss after suffering from persistent vomiting and nausea. Upon return, Diana had low potassium, epigastric pain, and elevated liver enzymes. Diana was admitted to inpatient care in Stormont-Vail's labor and delivery department. Despite IV treatment and nutritional support, Diana continued to lose weight. On August 29, 2018, Diana had a PICC line placed for delivery of TPN. Diana stayed on TPN through the birth of her child via cesarean section on October 20, 2018, and was then discharged on October 23.

*The Claims Process*

Stormont-Vail had been in communication with Sunflower Health throughout Diana's care. On September 28, 2018, Sunflower Health's Medical Director approved the dates of service of September 19 through September 27, but he recommended case management referral to evaluate the possibility of home health with the TPN. Sunflower Health's Medical Director testified that he "felt the patient ha[d] been stabilized and ha[d] been not requiring more care than just the TPN," and he stated that "as a physician, I know that TPN can be done outside the hospital." On September 28, 2018, on the

5

recommendation of Sunflower Health's Medical Director, someone with Sunflower Health left a message for Stormont-Vail inquiring about home health care options for Diana. Sunflower Health's Supervisor of Appeals and Grievances testified that Stormont-Vail never responded to Sunflower's Health's inquiry about the availability of home healthcare for Diana and that Stormont-Vail never submitted any notes or records demonstrating an attempt to arrange home healthcare in Emporia after that request.

Stormont-Vail submitted claims to Sunflower Health for Diana's inpatient services and care from August 21 to October 23, 2018. Sunflower Health agreed to pay for inpatient services from August 21 to October 4. On October 8, however, Sunflower Health denied reimbursement for inpatient medical services provided to Diana between October 5 to October 20. According to Sunflower Health, it denied the reimbursement because the "[m]edical necessity criteria were not met because information provided shows that you have no fever, you have no vomiting or diarrhea, your blood sugar levels are stable, and you are not requiring other treatment or tests that requires you to be in the hospital."

On January 31, 2019, Stormont-Vail requested that Sunflower Health review its denial, which it subsequently upheld. In upholding its initial denial, Sunflower Health reiterated much of what it initially stated but added that "[t]he care the member was receiving could have been safely and effectively provided in an outpatient setting by home health. [Sunflower Health] has numerous home health providers." Stormont-Vail appealed the denial to the Office of Administrative Hearings.

On October 15, 2020, an evidentiary hearing was held where the KDHE Appeals and Grievances Supervisor, Sunflower Health's Medical Director, Diana's treating physician Dr. Kimberly Brey, and Stormont-Vail's Physician Advisor all testified. The presiding officer issued an initial order upholding Sunflower Health's denial of the reimbursement, and Stormont-Vail appealed to the SAC. On May 31, 2022, the SAC

issued its Final Order upholding Sunflower Health's denial using a rationale virtually identical to the presiding officer's initial order from two years earlier.

Undeterred, Stormont-Vail petitioned the Shawnee County District Court for judicial review in June 2022. In its petition for review, Stormont-Vail alleged that it was entitled to relief for two reasons: (1) the SAC failed to properly apply the law and its decision was not supported by evidence; and (2) the SAC Final Order failed to give appropriate deference to the treating physician. On November 29, 2023, the district court filed a Memorandum Decision and Order dismissing Stormont-Vail's petition for review and upholding the SAC's decision. Stormont-Vail appealed.

## DISCUSSION

Stormont-Vail appeals the SAC's Final Order under the Kansas Judicial Review Act, which dictates the judicial review mechanism for applicable state agency administrative actions. K.S.A. 77-601 et seq.; *Bd. of Cherokee County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 318, 393 P.3d 601 (2017). A party can only appeal an agency action alleging errors and seeking relief as set forth in K.S.A. 77-621(c). This court exercises the same statutorily limited review of the agency's action as the district court does, just as though the appeal had been made directly to the appellate court from the agency's decision. 306 Kan. at 318. That means this court reviews the SAC decision.

On appeal, Stormont-Vail argues that the SAC (1) erroneously interpreted or applied the law; (2) made a fact determination not supported by substantial evidence; and (3) acted unreasonably, arbitrarily, or capriciously. K.S.A. 77-621(c)(4), (c)(7), (c)(8). When addressing the first argument, this court exercises unlimited review over the SAC's interpretation and application of the law. *Hanson v. Kansas Corp. Comm'n*, 313 Kan. 752, 762-63, 490 P.3d 1216 (2021). In either determining the facts necessary for the

7

appropriate legal application or whether the SAC's action was supported by substantial evidence, this court looks to the record as a whole, "including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation." K.S.A. 77-621(d); see *Hanson*, 313 Kan. at 762 (whether the Commission erroneously applied the law was an involved question requiring a review of facts). As the party appealing from the agency's decision, Stormont-Vail has the burden of establishing the invalidity of the action. See K.S.A. 77-621(a)(1); *Sierra Club v. Mosier*, 305 Kan. 1090, 1100, 391 P.3d 667 (2017).

Kansas Medicaid generally provides coverage, meaning contracted rates and reimbursement, for inpatient hospital services. K.A.R. 30-5-81(c). As with healthcare insurance coverage generally, the availability and rate of reimbursement are subject to limitations. While it may be commonly understood, inpatient hospital services are provided to patients who stay overnight at the healthcare facility and are typically more costly than outpatient services, such as home healthcare. See K.A.R. 30-5-58(bbbb). Because the inpatient healthcare services are more costly than outpatient, a healthcare provider "shall not be reimbursed on an inpatient basis for therapeutic and diagnostic surgical services, and related services that can be performed on an outpatient basis." K.A.R. 30-5-81(c)(6).

Reimbursement for inpatient healthcare services are subject to utilization review to determine whether:

- The services are medically necessary;
- The services are furnished at the appropriate level of care;
- The services are of a quality that meets professionally recognized standards;
- A discharge is premature;
- A transfer is necessary; and

8

- The procedure coding and the diagnosis coding on a claim are correct. K.A.R. 30-5-81(c)(7).

This means that a healthcare services provider, like Stormont-Vail here, must "document[] medical necessity," among other things, to receive reimbursement for inpatient healthcare services. K.A.R. 30-5-81(c)(6).

"'Medical necessity'" means that a health intervention is an otherwise covered category of services, is not specifically excluded from coverage, and is medically necessary, in that it meets all of the following criteria:

"(A) 'Authority.' The health intervention is recommended by the treating physician and is determined to be necessary by the secretary or the secretary's designee.

"(B) 'Purpose.' The health intervention has the purpose of treating a medical condition.

"(C) 'Scope.' The health intervention provides the most appropriate supply or level of service, considering potential benefits and harms to the patient.

"(D) 'Evidence.' The health intervention is known to be effective in improving health outcomes. For new interventions, effectiveness shall be determined by scientific evidence as provided in paragraph (ooo)(3). For existing interventions, effectiveness shall be determined as provided in paragraph (ooo)(4)."

"(E) 'Value.' The health intervention is cost-effective for this condition compared to alternative interventions, including no intervention. 'Cost-effective' shall not necessarily be construed to mean lowest price. An intervention may be medically indicated and yet not be a covered benefit or meet this regulation's definition of medical necessity. Interventions that do not meet this regulation's definition of medical necessity may be covered at the choice of the secretary or the secretary's designee. An intervention shall be considered cost effective if the benefits and harms relative to costs represent an

9

economically efficient use of resources for patients with this condition. In the application of this criterion to an individual case, the characteristics of the individual patient shall be determinative." K.A.R. 30-5-58(ooo)(1).

The parties do not dispute that the inpatient services at issue here met three of the five criteria for medical necessity: Authority, Purpose, and Evidence. The SAC Final Order concluded that Stormont-Vail failed to show that Diana's inpatient healthcare services between October 5 to October 20 met the scope and value criteria of medical necessity. Stormont-Vail contends that the SAC incorrectly focused on the ultimate cost of the health intervention to determine that it did not meet the scope and value criteria rather than evaluating the potential harms and benefits considering Diana's unique characteristics.

In reviewing the SAC's application of the law, this court must also review the factual findings to determine whether the record supports those facts. See *Hanson*, 313 Kan. at 762 (whether the Commission erroneously applied the law was an involved question necessitating a review of facts). This court reviews those factual findings "in light of the record as a whole" to include evidence supporting and detracting from the SAC's findings. K.S.A. 77-621(d).

I.    KDHE'S FACTUAL FINDINGS

Stormont-Vail contends that the SAC wrongly disregarded Diana's treating physician's medical opinion and that it should have given the treating physician's medical opinion deference. The SAC made factual findings supporting its decision to disregard the treating physician's medical opinion, and perhaps much of the Stormont-Vail medical record. These factual findings appear to have contributed to the SAC's medical necessity analysis.

The Medicaid program is mandated and authorized through Title XIX of the Social Security Act, 42 U.S.C. § 1396, and it does not statutorily require that the treating physician's medical opinion be given deference. Unlike the Social Security Disability Insurance program, which is also authorized by the Social Security Act, the Medicaid program is a joint state and federal program where individual states may adopt reasonable standards for determining eligibility and the extent of medical assistance under the plan consistent with Medicaid's purposes. See *Beal v. Doe*, 432 U.S. 438, 444, 97 S. Ct. 2366, 53 L. Ed. 2d 464 (1977); *Brewer v. Schalansky*, 278 Kan. 734, 738, 102 P.3d 1145 (2004). The Medicaid program provides medical assistance to disabled individuals with financial need, and the Kansas Legislature has extended Medicaid eligibility to nondisabled persons with "insufficient income or resources to provide a reasonable subsistence compatible with decency and health." K.S.A. 39-709(a)(1).

The Social Security Disability Insurance program is also authorized by the Social Security Act and provides benefits based on patient disability determinations. Unlike the Medicaid program, before regulatory changes in March 2017, in disability determinations under the Social Security Act the reviewing agency gave the treating physician's medical opinion deference. *Robb v. Colvin*, No. 13-1267-JWL, 2014 WL 3894358, at *4 (D. Kan. 2014) (unpublished opinion) (noting that a reviewing agency cannot ignore the medical opinion of treating physicians when reviewing social security benefit claims). This standard was eventually incorporated into the statutory language. See *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833-34, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003) (distinguishing ERISA disability determinations from the treating physician deference requirements of the Social Security Act). Before March 2017, the treating physician's medical opinion was generally given "more weight" than other opinions, and even "controlling weight" if the agency found it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(c)(2) (2024).

11

However, the treating physician deference standard was removed from the Social Security Disability Insurance regulations on March 27, 2017, in favor of an overall evaluation of the persuasiveness of all medical opinions. 20 C.F.R § 404.1520c(a), (c) (2024); see also *Victoria Jean G. v. Kijakazi*, No. 20-4053-JWL, 2021 WL 4168124, at *4 (D. Kan. 2021) (unpublished opinion) (discussing this change to the regulatory scheme). Instead of automatic deference, the reviewing administrative law judge (ALJ) must consider the competing medical opinions' supportability and consistency as the most important factors, but also considers the medical providers' relationship with the claimant and specialization along with other factors that "tend to support or contradict a medical opinion." 20 C.F.R § 404.1520c(a), (c); see also *Victoria Jean G.*, 2021 WL 4168124, at *4. While no longer adhering to a formulaic deference to the treating physician's medical opinion, in evaluating the persuasiveness of medical opinions, the ALJ must still consider the physician's treatment relationship with the patient including the length of relationship, frequency of exams, purpose of treatment, extent of treatment relationship, and examining relationship. 20 C.F.R § 404.1520c(c)(3). This demonstrates that, all other persuasiveness considerations being equal (particularly supportability and consistency), the treating physician's medical opinion will likely carry more weight.

Although the Social Security Disability Insurance program and Medicaid programs differ, many states have found that in a Medicaid medical necessity determination the reviewing agency must afford some level of deference to the treating physician's medical necessity opinion. See, e.g., *Weaver v. Reagen*, 886 F.2d 194, 199-200 (8th Cir. 1989) (discussing Medicaid purpose and treating physician deference in the context of a state-created, irrebuttable presumption that a particular treatment could never be medically necessary); *A.M.L. v. Dept. of Health, Div. of Health Care Financing*, 863 P.2d 44, 48 (Utah Ct. App. 1993). "The Medicaid statute and regulatory scheme create a presumption in favor of the medical judgment of the attending physician in determining the medical necessity of treatment." *Weaver*, 886 F.2d at 200. However, unlike the disability determinations under the Social Security Act, for Medicaid determinations,

12

"[b]oth the treating physician and the state have roles to play," and therefore, "'[a] private physician's word on medical necessity is not dispositive.'" *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1255 (11th Cir. 2011).

While there is not an abundance of Kansas caselaw related to this issue, this court finds no legal authority to dispute the parties' apparent agreement that the treating physician's medical opinion must be afforded some relative consideration. When evaluating contradictory or inconsistent medical opinions regarding the medical necessity of a healthcare intervention in the Kansas Medicaid program, the reviewing agency must consider the relative length and depth of the medical professionals' relationships with the patient. The reviewing agency must set forth a legitimate, reasoned basis substantiated by the record and consistent with Medicaid's purpose for disfavoring a treating physician's medical opinion. See *Stormont-Vail Healthcare, Inc. v. Kansas Health Policy Authority*, No. 10 C 51, 2010 WL 3415107, at *5-6 (Kan. 3d Jud. Dist. Ct. August 31, 2010) (physicians who personally evaluated and treated a particular patient must be given deference in determining whether a health intervention was or was not a medical necessity for purposes of Medicaid reimbursement); *Stormont-Vail Healthcare, Inc. v. Kansas Dept. of Health and Environment, Div. of Healthcare Finance*, No. 2018-CV-795, at *19-21 (Kan. 3d Jud. Dist. Ct. August 5, 2019); *Visser v. Taylor*, 756 F. Supp. 501, 507 (D. Kan. 1990) (medical necessity based on professional medical judgment of treating physician).

The importance of the medical opinion of a treating physician with a long and comprehensive treatment relationship with the patient is undeniable, but not irrefutable. See, e.g., *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987) (discussing the rule that in the social security disability context, if the opinion of the treating physician is to be disregarded, the agency must give specific, legitimate reasons for doing so). The reviewing agency may support a decision to disfavor a treating physician's medical opinion when the treating physician has a relatively brief or tangential treatment

13

relationship with the patient or the treating physician's medical opinion is conclusory or unsupported by medical evidence.

The SAC disregarded the treating physician's medical opinion and much of the medical record. According to the SAC, the "reasons why deference was not provided to the treating physicians" included:

1. "Stormont failed to follow-up on the request to investigate home health care and relied on outdated information";
2. "The medical records were not always accurate because they included interventions that did not occur such as the Dobhoff tube";
3. Diana "was seen spitting instead of vomiting as she reported"; and
4. "The notes were literally copied and pasted, and minor adjustments made."

First, Stormont-Vail's failure to call home health agencies to see if they would accept Diana as a patient is not a reason to disregard Dr. Brey's medical opinion or the medical record. See, e.g., *Frey*, 816 F.2d at 514-15 (explaining that the treating physician's failure to perform certain tests was not a reason to disregard the treating physician's findings). The core disagreement between Stormont-Vail and Sunflower Health is whether Diana was appropriate for discharge and to receive home healthcare given her condition and individual characteristics. A home healthcare agency's willingness to accept Diana as a patient, which undoubtedly would have cost less than inpatient care, does not mean inpatient care was not medically necessary. To the extent the SAC disregarded the treating physician's medical opinion because Stormont-Vail failed to call home healthcare agencies to see if they would accept Diana as a patient, that was not a reasoned basis consistent with the purposes of Medicaid and was an error.

Second, although the inaccuracy of Stormont-Vail's medical record could support the SAC's decision to disfavor the treating physician's medical opinion, the reasons cited here are not sufficient. The SAC Final Order states that "[t]he medical records were not

14

always accurate because they included interventions that did not occur such as the Dobhoff tube," but the SAC fails to support that factual finding. In this review, the appellate court must determine whether substantial evidence supports the agency's factual findings when considering the record as a whole. K.S.A. 77-621(c)(7), (d); *Hanson*, 313 Kan. at 763. While Stormont-Vail checked with Emporia care providers to see if they could care for Diana with a Dobhoff tube, the SAC cites no inaccuracy in Stormont-Vail's medical record regarding the Dobhoff tube.

The record, including notes from social workers, case managers, physicians, and dieticians, shows that early in Diana's care Stormont-Vail explored several options to treat her condition without inpatient care—including the Dobhoff tube through the nose to deliver maternal and fetal nutritional support. A note states that "Dr. Grant checked with Emporia to see if [Diana] could go back and they could manage a Dobhoff there, they stated no, they do not." A case management note states that a nurse spoke with Diana's Emporia provider "to discuss options for nutrition" and the Emporia provider "states that [patient] cannot [discharge] with any type of tube or IV [due to] inability to manage at home, she also informs that Emporia will not be able to monitor [patient] in their hospital with PICC line and TPN, they are not equipped to perform that care." A note from Dr. Grant stated that they were also exploring having Diana stay at a Ronald McDonald House in Topeka and then come to Stormont-Vail "daily at our infusion center or if Emporia is able to provide assistance with the dobhoff and enteral feedings. They do not do PICC lines and TPN." However, by August 17, Stormont-Vail determined that the Dobhoff tube would be inappropriate due to "clogging, dislodging and management for [patient]." It was noted that "[u]nfortunately patient's capacity is not up to personally caring for a PICC line or dobhoff."

These notes show that early on Stormont-Vail explored ways to treat Diana that would have permitted her to return to Emporia or stay at a nonprofit organization in Topeka. To the extent the SAC found the medical record inaccurately stated that Diana

15

received a Dobhoff tube or that Stormont-Vail failed to document asking Emporia providers about discharge with a PICC line for TPN, the SAC failed to show support in the record for that factual finding and this court finds none. Thus, the SAC's finding that medical record inaccuracies related to the Dobhoff tube support its decision to disfavor the treating physician's medical opinion was an error.

Third, the SAC contends that Diana's medical record notes were copied and pasted from day to day. In support of this finding, the SAC points to a notation that Diana "lives far away, unable to get outpatient [TPN] daily close to her home" which was allegedly copied and pasted. The SAC Final Order also identified care plan notes that were copied with minor changes from October 5 to 18. While the care plan did not significantly change over time, the SAC cites no contrary medical evidence that the care plan was inappropriate for the condition, or that it was not supported by medical evidence. The SAC also pointed to a nurse note that Diana was seen spitting saliva, but not vomiting as reported, to apparently disregard reports of nausea and vomiting throughout the medical record. The SAC did not address the other records related to Diana's anti-nausea treatment. There is insufficient evidence that the repetitive care plan notes, or the nurse note regarding spitting rather than vomiting, makes the medical record so unreliable as to justify disregarding it or the treating physician's medical opinion.

The SAC failed to establish sufficient factual findings to support its decision to disregard the treating physician's medical opinion.

II.    MEDICAL NECESSITY

Stormont-Vail contends that the SAC inaccurately applied the law in its medical necessity determination by inappropriately focusing on the costs of inpatient care versus home healthcare and Stormont-Vail's failure to call home healthcare agencies. The parties agree that only the scope and value criteria of medical necessity are at issue here.

16

*The Scope Criteria of Medical Necessity for Inpatient Care*

The SAC Final Order correctly summarized the scope criteria of medical necessity as "the most appropriate level of service considering the potential benefits and harm to the patient." More specifically, the appropriate scope is defined as "[t]he health intervention provides the most appropriate supply or level of service, considering potential benefits and harms to the patient." K.A.R. 30-5-58(ooo)(1)(C).

After defining "scope," the SAC then described some of Diana's health conditions and circumstances including that she is "likely mentally retarded" and was "noncompliant with hospital protocol and required lots of empathy, soothing, calming, and encouragement." It also noted that because of Diana's "identified limitations, concern existed whether she could properly care for the PIC[C] line and administer TPN." It then noted that because "no other active treatment or testing was being provided to [Diana] during the days in issue," Sunflower Health believed outpatient home healthcare could be an option and requested that Stormont-Vail investigate that option but "Stormont failed to do so." It explained some of Stormont-Vail's concerns but stated "there is nothing in the record to show that any treating physician or Stormont in general looked into whether home health was a viable option. Because of this, it cannot be said that hospitalization was the appropriate scope for [Diana's] medical care." The SAC concluded that Stormont-Vail's failure to demonstrate effort to find a home healthcare agency that would accept Diana as a patient meant that the record did not demonstrate inpatient care was the proper scope of healthcare intervention from October 5 to 20. That is not an accurate application of the scope criteria of medical necessity.

The question is whether the record demonstrates that inpatient care was the most appropriate level of health intervention "considering potential benefits and harms to the patient." K.A.R. 30-5-58(ooo)(1)(C). The SAC noted that while Diana had a PICC line for TPN, "[h]aving a PIC[C] line does not necessarily require hospitalization." It appears

undisputed that having a PICC line for TPN during pregnancy does not always require inpatient hospitalization. There is also no doubt that, when medically appropriate, home healthcare is less costly than inpatient healthcare. It appears that the cost savings between inpatient care and home healthcare was the SAC's only identified benefit/harm.

The Sunflower Health Medical Director believed that Diana was stable enough to discharge because she had "no documentation of current fever, vomiting, diarrhea, [Diana's] blood sugar was stable, and no additional treatment or testing was planned, other than continuation of TPN." Diana's treating physician—whom the SAC wholly disregarded based on insufficient factual findings—testified that Diana was not stable for discharge as of October 5, 2018, because Diana would be unable to maintain the appropriate health-related metrics for her condition if discharged. This speaks to the definition of the "'scope'" criteria considering the potential benefit and harm. See K.A.R. 30-5-58(ooo)(1)(C). It appears that by disregarding the treating physician's medical opinion, the SAC implicitly adopted Sunflower Health's Medical Director's opinion that Diana was stable for discharge, and thus the SAC concluded there were no benefits to inpatient care that outweighed the harm (increased cost).

Even assuming Diana was stable enough to be discharged on October 5, the scope criteria of medical necessity requires that the reviewing agency consider the potential harms and benefits to Diana. First, Stormont-Vail noted that the Emporia hospital said it could not care for Diana with a PICC line for TPN, and Diana had already been transferred from Emporia to Topeka because the Emporia hospital could not care for her condition. In other words, the record shows that if Diana's condition destabilized while receiving home healthcare in Emporia, the local hospital would be unable to care for her with a PICC line for TPN. While the Sunflower Health Medical Director speculated that the Emporia hospital should have been able to care for a pregnant patient with a PICC line for TPN, that speculation alone is not substantial evidence when the record is viewed as a whole. Second, Stormont-Vail identified medical interventions taken during the

18

relevant time frame that it concluded made Diana inappropriate for home healthcare. Third, it appears undisputed that Diana did not have an obstetrics provider in Emporia who was willing to accept her as a patient in the last few weeks of her pregnancy.

When addressing the scope criteria of medical necessity, the SAC failed to address the benefits and harms—other than the higher cost of inpatient care—to determine whether inpatient care provided the most appropriate level of service. Moreover, if the SAC did not believe any benefit existed for inpatient care or potential harm existed for Diana to be discharged to receive home healthcare in Emporia, that factual determination was not supported by the evidence. Even if the SAC properly favored Sunflower Health's Medical Director's medical opinion that Diana was stable for discharge, it cannot ignore the evidence in the record showing the potential harms and benefits to the patient.

*The Value Criteria of Medical Necessity for Inpatient Care*

The SAC concluded that Stormont-Vail failed to meet the value criteria of medical necessity for Diana's inpatient care from October 5 to October 20. The SAC Final Order explained that "it cannot be shown that continued hospitalization was the best value" because "there is limited evidence that Stormont explored alternative interventions for [Diana]." The SAC explained:

> "If [Diana] could have received the TPN and PIC[C] care she needed at home, that would be the most cost-effective way to deliver the care to her. If it could not be provided, continued hospitalization could have been the most cost-effective way to provide the needed care."

While the value criteria of medical necessity includes a determination of whether "[t]he health intervention is cost-effective for this condition compared to alternative interventions, including no intervention," the value means more than merely using the

19

least or even the less expensive health intervention. See K.A.R. 30-5-58(ooo)(1)(E). The definition of "'value'" explains that "'[c]ost-effective' shall not necessarily be construed to mean lowest price." K.A.R. 30-5-58(ooo)(1)(E). The definition provides that a medical intervention "shall be considered cost effective if the *benefits and harms relative to costs* represent an economically efficient use of resources for patients with this condition. In the application of this criterion to an individual case, *the characteristics of the individual patient shall be determinative*." (Emphases added.) K.A.R. 30-5-58(ooo)(1)(E). When evaluating whether a health intervention meets the value element of medical necessity, the reviewing agency must make an individualized determination of the benefits and harms relative to costs based on the patient's particular characteristics.

Stormont-Vail contends that Diana presented with unique characteristics that it believed necessitated continued inpatient care, including:

- Diana suffered from intellectual disabilities that the Stormont-Vail providers believed prevented Diana from caring for herself with a PICC line at home;
- Diana was diagnosed with and suffered from hyperemesis gravidarum (severe nausea and vomiting in pregnancy) causing a failure to gain weight and significant weight loss in the second and third trimester of pregnancy. Diana lost 3 pounds from July 31 to August 7 and lost 7 pounds from August 7 to 10, going from 130 pounds to 123 pounds in the third trimester of pregnancy;
- Diana was medically transferred to Stormont-Vail from Emporia because the Emporia hospital could not successfully treat her hyperemesis gravidarum;
- Diana required a PICC line to receive TPN to receive sufficient nutrition for herself and fetal development;

20

- Diana's hometown hospital in Emporia reported it was unable to care for a pregnant patient receiving TPN through a PICC line;

- Diana's social worker had previously told Dr. Brey that they could not find an Emporia home healthcare agency to accept Diana because of her pregnancy;

- Diana's documented history of noncompliance with medical directives and anxiety, requiring directed nurse care;

- Diana suffered from daily abdominal pain and excessive saliva production causing gagging and spitting;

- Diana needed regular anti-nausea medication intravenously;

- Diana needed diabetes monitoring and management; and

- Emporia physicians declined to accept Diana as an obstetrics patient which meant that she would not have had regular medical care during her pregnancy if she were in Emporia.

Stormont-Vail's Physician Advisor, Dr. Sri Suravarapu (Dr. Sri), testified that Diana's entire medical record—which included records from the dietitian, nutritionist, obstetrician, psychiatrist, social worker, and nurses—must be reviewed to determine whether inpatient treatment met the value criteria for medical necessity. As examples of needed ongoing inpatient care, Dr. Sri noted that Diana needed and received three separate intravenous anti-nausea medications on October 8. Dr. Sri also pointed out that Diana's treatment changed on September 27 and September 30 and testified that Diana needed monitoring for diabetes management and to keep her electrolytes in the appropriate range.

The SAC Final Order explained that although the record included notations for vomiting, "[o]ne nurse's note acknowledges that [Diana] said she vomited, but there was no physical evidence of it" because the nurse saw her spitting rather than vomiting, and

21

the SAC explained that "[j]ust saying it does not make it so." Therefore, the SAC concluded "reliance on [Diana] vomiting as a reason for continued inpatient hospitalization is not justified," but then it failed to address whether or how Diana's other individual characteristics impacted the value criteria for inpatient care. For example, a note from a physician assistant on October 16 states that Diana had "[n]ausea every time she wakes up" and a note from Dr. Brey on October 11 also noted nausea. This court recognizes that the SAC is dubious of whether Diana vomited on some of these days and does not discount that suspicion. However, that suspicion does not negate the entire record.

Coupled with Diana's other conditions, Stormont-Vail identified the potential benefits and harms of inpatient care with a PICC line for TPN related to Diana's intellectual disability and anxiety. As evidence of how Diana's anxiety and intellectual disability impacted her ability to perform self-care, Stormont-Vail pointed to Diana's frequent refusal of care and the need for directed care. A short review of the medical record reveals Diana's refusal to allow monitoring of fetal development and condition, refusal to take prescribed medication on several occasions including October 13, refusal to eat on multiple days from September 5 to October 5, repeated refusal to wear sequential compression devices to prevent blood clots, and refusal to allow blood work for laboratory tests. These are examples of Stormont-Vail's concern that Diana's particular conditions of anxiety and intellectual disability coupled with her hyperemesis gravidarum required persistent directed care to ensure proper nutrition and monitoring for fetal development.

The SAC failed to address whether Diana's need for these medications and interventions, given her individual characteristics of anxiety and intellectual disability, impacted the benefits and harms of inpatient care rather than discharge to home healthcare. Nor did the SAC address the potential harm of Diana's individual

22

characteristic of not having an obstetrics provider or local hospital in Emporia willing or capable of caring for her with a PICC line for TPN.

CONCLUSION

The SAC Final Order had insufficient factual findings based on the record as a whole to support its decision to disregard the treating physician's medical opinion. Additionally, the SAC erroneously applied the law when it heavily relied on Stormont-Vail's failure to document whether home healthcare agencies in Emporia would accept Diana as a patient in the last few weeks of pregnancy to conclude that Diana's inpatient care did not meet the Kansas Medicaid scope and value criteria of medical necessity. Rather, the SAC was required to determine whether inpatient care was the most appropriate level of services and was cost effective when evaluating the harms and benefits of the care based on Diana's individual characteristics. See K.A.R. 30-5-58(ooo)(1)(C), (ooo)(1)(E).

The district court's decision is reversed. Pursuant to 77-622(b), the SAC's final order is vacated and this matter is remanded to the district court with directions to remand to the agency for reconsideration consistent with the application of the scope and value criteria of medical necessity. As set forth in the applicable regulations, the SAC must consider Diana's individual characteristics when evaluating the benefits and harms of the healthcare intervention. On remand, if the SAC disfavors the treating physician's medical opinion it must set forth a legitimate, reasoned basis supported by factual findings from the record as a whole.

Reversed and remanded with directions.

23